800 P.2d 656

Richard **GARNETT**, Deborah Garnett, husband and wife, Individually, and David Garnett, dba Perfect Paints and Flooring, Plaintiffs–Respondents,

v.

**TRANSAMERICA INSURANCE SERVICES**, an Indiana corporation, Defendant–Appellant,

and

Harris/Dean Agency, Inc., an Idaho corporation, Defendant.

No. 17740.

Supreme Court of Idaho.

Oct. 31, 1990.

Cook, Lamanna, Smith & Cogswell, Priest River, and Bullivant, Houser, Bailey, Pendergrass & Hoffman, Portland, Or., for defendant-appellant. I. Franklin Hunsaker, Portland, argued.

Aherin & Rice, Lewiston, attorneys for plaintiffs-respondents. Darrel W. Aherin, Lewiston, argued.

JOHNSON, Justice.

This is a fire insurance case. The issues presented are:

1. Was the trial court correct in allowing the jury to decide whether the insureds (the Garnetts) were entitled to payments from the insurance company (Transamerica) for repair or replacement of the damaged property before the Garnetts completed the reconstruction and documented the cost?

   We hold that the trial court properly allowed the jury to decide this question.

2. Was the trial court correct in allowing the jury to decide whether the Garnetts were entitled to payments from Transamerica for improvements to the damaged property required by the local building code during the reconstruction of the damaged property?

   We hold that the trial court correctly interpreted the insurance policy in allowing the jury to decide this question.

3. Was the trial court correct in not dismissing the Garnetts' claim for breach of the covenant of good faith and fair dealing?

   We hold that there was substantial evidence to support a finding by the jury that Transamerica breached the covenant of good and fair dealing.

4. Was the trial court correct in allowing the jury to award the Garnetts punitive damages?

   We hold that the trial court did not abuse its discretion in denying Transamerica's motions for directed verdict and for judgment n.o.v. on this question.

5. Was the trial court correct in allowing the jury to consider whether the Garnetts were entitled to damages for emotional distress and in allowing the Garnetts' attorney to argue to the jury that the Garnetts were entitled to damages for stress?

We decline the invitation to rule on this issue, because the trial court did not instruct the jury to consider emotional distress in awarding damages and because the record before us does not contain the arguments of counsel to the jury.

6. Was the trial court correct in awarding attorney fees to the Garnetts?

We hold that the trial court correctly awarded attorney fees to the Garnetts.

## I.

## THE BACKGROUND AND PRIOR PROCEEDINGS.

On September 7, 1985, a fire damaged personal property, inventory, and a commercial building owned by the Garnetts and insured against loss due to fire under a policy issued by Transamerica. Transamerica was immediately notified of the loss and began investigating. Transamerica secured from Richard Garnett an agreement that by investigating the cause of the fire and other facts concerning the fire Transamerica did not waive or invalidate any of the conditions of the policy.

On September 24, 1985, a claims adjuster from Transamerica wrote to the Garnetts saying that the cause of the fire was under investigation and requesting a meeting with the Garnetts to obtain a drawing of the building, indicating where the personal property was located at the time of the fire. The letter also advised the Garnetts of their duties and responsibilities under the Transamerica policy. Among these was the duty to submit to Transamerica within sixty days after requested a signed, sworn statement of loss setting forth to the best of the Garnetts' information and belief "specifications of any damaged building and detailed estimates for repair of the damage" and "an inventory of damaged personal property." Enclosed with the letter were forms for the submission of claims for loss due to the fire. The letter concluded by stating that Transamerica would continue to insist upon full and complete compliance with all of the insurance policy terms and conditions and the laws of Idaho and that no waiver or estoppel was intended or should be interpreted.

In late October 1985, an appraiser employed by Transamerica to appraise the Garnetts' building advised Transamerica that the market value of the building before the fire was $122,500.00.

In early November 1985, Transamerica's attorney conducted an examination of the Garnetts under oath concerning the fire and their losses. At that time, the Garnetts were unable to provide completed, signed and sworn claims as required by the policy. In that examination, the Garnetts stated that they intended to rebuild the building.

During November and December of 1985, an attorney representing Transamerica and an attorney representing the Garnetts exchanged correspondence concerning the claims for payment by the Garnetts. In some of his letters, the attorney for Transamerica requested that the Garnetts produce documents for Transamerica to inspect and copy. These documents included invoices, financial records, checking account statements and cancelled checks.

In late December 1985, the Garnetts submitted claims to Transamerica for payments to rebuild the damaged structure, for loss of personal property and rents, and for extra expense due to the fire. The Garnetts estimated the cost to replace or repair the building at $400,000.00, the loss of inventory and personal property at more than $140,000.00, the loss of rents at $10,800.00, and the extra expense at $5,000.00.

In early January 1986, the attorney for Transamerica wrote to the attorney for the Garnetts again requesting the documents that had been requested earlier, as well as other records. In this letter, Transamerica's attorney acknowledged the receipt of the claims for payment of the Garnetts. The letter stated:

The company is continuing its investigation into the cause of this loss, the amount of the loss sustained by [the Garnetts], and its obligations under the policy. Examination by the company of the above requested documents is imper-

ative so that the company can complete its investigation.

. . . .

On behalf of the company I have provided you with substantial information obtained by the company from various contractors, engineers and appraisers. That information was provided to your clients so they could submit estimates of a cost of repair and actual cash value loss figures should they choose to do so. To date, no such information has been received by the company.

In the meantime, the insurance company continues to insist upon full and complete compliance with all of the terms and conditions of the policy of insurance and the laws of Idaho. No waiver or estoppel of any kind is intended.

The attorney for the Garnetts responded within a few days, stating that some of the documents requested had been available for copying by Transamerica since the examination of the Garnetts in November and that the Garnetts would make arrangements for copies of the others to be provided by the bank.

In early February 1986, Transamerica's attorney wrote to the Garnetts' attorney stating that he had received the inventory claim with supporting invoices forwarded by the Garnetts' attorney. He also stated that the Garnetts had produced the information previously requested, except the bank statement information that would be provided within a week.

On February 14, 1986, Transamerica sent a check for $122,500.00 to the attorney for the Garnetts. This check was payable jointly to the Garnetts, to the person from whom they were purchasing the building and to others who were listed as lien holders on the property. The letter transmitting the check included these statements:

Transamerica is making payment of this check in the amount of the actual cash value of the building loss, but not more than the interests of the loss payees. This payment is made naming your clients because of the answers which they have provided to the questions asked of them at their examinations under oath.

You and your clients, as well as the loss payees and equitable lienholders are free to negotiate this check without waiving any of their rights to claim that they are entitled to additional funds under the policy of insurance.

. . . .

The policy of insurance provides for replacement cost coverage of the building loss providing the building is actually repaired or replaced by the insureds. I direct your attention to those provisions in the policy when submitting your claim for replacement cost coverage to the building. I have attached a copy of the value pacer to this letter for your review. Form # F 10822A.

In the meantime, the insurance company continues to insist upon full and complete compliance with all of the terms and conditions of the policy of insurance and the laws of Idaho and continues to reserve its rights and defenses. No waiver or estoppel of any kind is intended nor should be inferred from this letter.

The value pacer endorsement referred to in this letter stated that the agreed replacement cost of the building was $444,444.00 and included the following condition:

3. The Company shall not be liable under this endorsement for any loss unless and until the property is actually repaired or replaced by the insured with due diligence and dispatch.

In late February 1986, the Garnetts obtained a bid of $333,500.00 for the reconstruction of the building and furnished this bid to Transamerica. On February 24, 1986, the Garnetts' attorney wrote a letter to Transamerica in which he acknowledged receipt of the letter of February 14, 1986, and enclosed the check for $122,500.00. In his letter, the Garnetts' attorney said:

This letter will advise you that we are treating the $122,500 as an advance against the monies claimed by Rick Garnett in regard to this loss. You have stated that the actual cash value of the building ... is $122,500. This, of course, is only your opinion as to the value of the

building and is not binding on us. Additionally, I cannot see that it has any bearing on this claim, because as Mr. Garnett told you in the oral examination, he fully intends to rebuild the building. The actual cash value of the policy only applies in the event the new construction is not going to occur.

. . . .

It appears you are now attempting to force the Garnetts to go out and make all of the repairs on the building, and after all the work is completely done, then you will consider paying some more money. This is a totally unacceptable approach as you possess the full knowledge that the Garnetts would not have the kind of money needed to make the repairs and wait for Transamerica to then reimburse them on the insurance policy.

Insureds take out insurance with the full expectation that as the repairs are made, the insurance will cover the cost and see the work to completion. You have within your knowledge that the repair cost is approximately $333,000.

Five months after this loss incurred, you send a letter advancing some money without explaining your overall position in this matter. More than thirty days have expired since the proof of loss was submitted to you, and the Garnetts still do not know if you are going to pay the claim, reject the claim or make this partial payment in an attempt to get the Garnetts in a position to be subject to some compromise proposal which you make.

. . . .

Since your letter of February 14, 1986, does not mention how you are going to proceed with the handling of this claim, my clients are filing a lawsuit against Transamerica, as there appears there is no other way to deal with Transamerica except by proceeding in court.

On February 28, 1986, a claims adjuster for Transamerica wrote to the Garnetts' attorney stating that after the Garnetts had spent the $122,500.00 on repairs Transamerica was willing to make proportional payments as repairs were completed. The letter also stated that Transamerica believed that the full repair cost for the repairs to the building was in the range of $219,000.00 and that Transamerica was reviewing the claim for loss of personal property and inventory and rent.

On February 28, 1986, the Garnetts filed the complaint in this case, alleging breach of contract, breach of duty of good faith and fair dealing, negligent and/or intentional infliction of emotional distress, common law fraud, statutory violations and breach of fiduciary duty. The Garnetts requested $400,000.00 as the cost of replacing the building, $75,000.00 for loss of personal property, $10,800.00 for lost rents and $5,000.00 for extra expenses, together with general and punitive damages, attorney fees and costs.

In early March 1986, Transamerica wrote to the Garnetts' attorney stating that when Transamerica had received all estimates of the repairs, the company would be able to analyze the total amount of repairs. Two days later, Transamerica sent a check for $79,542.67 to the Garnetts' attorney, representing the actual cash value of the contents of the building that were damaged ($61,542.67) and lost of rents for the period beginning on the date of the fire up to July 1986 ($18,000.00). The company's evaluation of the repairs during this period showed that the premises could be rebuilt, barring complications. The Garnetts' attorney responded, stating that the money would help relieve some of the financial pressure the Garnetts were experiencing and that "the advance on the building will at least get the building repairs started."

In late March 1986, Transamerica's attorney furnished to the Garnetts' attorney an estimate of the cost of repairing the damage to the building, showing a total cost of $219,064.32. In early April, Transamerica's attorney wrote to the Garnetts' attorney enclosing a bid by Associated Building Components, Inc. (ABC) to repair the building, showing a total cost of $236,406.00 plus Idaho sales tax on the materials to be used. In this letter, Transamerica's attorney said:

Please be advised that the payments which have been made to date are the company's determination of what it owes at this time. As pointed out to you by [Transamerica's claims adjuster], the policy does provide for replacement cost coverage on the building. If the insureds intend to repair the building, they should follow the provisions contained in the policy.

On April 10, 1986, Transamerica answered the Garnetts' complaint. In its answer, Transamerica alleged that the Garnetts had not performed the conditions precedent for further payment under the policy, "mainly repair or replacement of the damaged property."

In the late spring and early summer of 1986, the Garnetts were attempting to obtain a building permit from the City of Coeur d'Alene for the reconstruction of their building. It had been determined that the walls of the building that remained standing after the fire could be used as part of the reconstruction. This made it possible for the Garnetts to obtain a building permit that retained the non-conforming features of their building and made it unnecessary for them to comply with the minimum side street setback requirement and the required on-site parking that would have been a condition of building a new building under the existing building codes. However, the city required that one-half of the estimated replacement cost of the building include items necessary to meet Uniform Building Code requirements.

In July 1986, the Garnetts submitted to the city an estimate of the replacement cost of their building. This estimate was made by a local appraiser based on the ABC bid of $238,447.84, to which the appraiser had added $5,000.00 for possible code changes. He then rounded the estimate to $243,500.00. In late July 1986, the city accepted this amount as the replacement cost for the building. At that time, the city advised the Garnetts that when they submitted their plans for a building permit they should also submit a cost estimate of the construction work to be done so that the city could determine which items were required by the Uniform Building Code and which were not.

The blueprints for the reconstruction of the building were completed in August 1986 and furnished to Transamerica. That same month, the clean up of the debris from the fire finally began, following approval from the city that the walls would not have to be replaced and negotiations between the Garnetts and Transamerica about payment of the cost. Shortly thereafter, the Garnetts received a building permit from the city and reconstruction of the building began. The contractor estimated that if the full amount of his bid of $312,288.74 had been available for draws as portions of the work were finished, the reconstruction could have been completed in three or four months.

In early October 1986, the attorney for Transamerica wrote to the Garnetts' attorney acknowledging receipt of a copy of the reconstruction bid and drawings. In this letter, Transamerica's attorney said that to insure that "Transamerica's involvement in the repair process is properly coordinated, we will need to see more detailed bid materials, as the information which you have forwarded does not specify the types of material or other detailed information relating to the cost and nature of the reconstruction." This letter also referred to a portion of the policy stating:

## VII. EXCLUSIONS

1. This policy does not insure against loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

A. Loss occasioned directly or indirectly by enforcement of any ordinance or law regulating the use, construction, repair, or demolition of buildings or structures including debris removal expense.

In relation to this provision, the letter concluded: "Thus, any improvements to the structure required, for example by the electrical code, would not be covered under the policy."

In late October 1986, pursuant to Transamerica's motion, the trial court dismissed all of the claims contained in the complaint, except the claim for breach of contract.

On November 3, 1986, the Garnetts' attorney wrote to Transamerica reporting that the Garnetts had spent the $122,500.00 paid by Transamerica in February toward the reconstruction of the building. He noted that the reconstruction had been halted because the Garnetts did not know how much more Transamerica would advance. He said that it was "important to have Transamerica make a commitment as soon as possible as to how much additional money they will advance without disagreement, so the contractor can continue to finish the bulk of the work."

On November 14, 1986, the Garnetts' attorney again wrote to Transamerica saying that he had not heard from the company concerning further authorization. He pointed out that the Garnetts continued to lose money because the building was not completed.

On November 19, 1986, Transamerica sent the Garnetts two checks, one dated October 19, 1986, for $105,630.43 for the remaining portion of the repairs to the building and a second dated November 19, 1986, for $3,600.00 representing the remaining policy limits for loss of rents. The amount of the check for repairs was calculated by deducting from the ABC bid ($238,468.26), to which had been added amounts for tree trimming, architectural and appraisal fees, the initial payment of $122,500.00, debris removal of $14,000.00 previously paid and other miscellaneous amounts. In a letter the next day from Transamerica's attorney to the Garnetts' attorney, Transamerica offered to pay an additional $15,000.00 in exchange for a release from the Garnetts and a dismissal of the lawsuit against Transamerica. The letter closed: "Finally, Transamerica continues to reserve all rights and defenses under its policy. No waiver or estoppel is intended, nor should be implied."

The Garnetts used the additional payment from Transamerica to begin reconstruction of the building again. This was the last payment Transamerica made toward the reconstruction of the building.

In January 1987, the trial court reinstated the claim of the Garnetts for damages based on the breach of Transamerica's duty of good faith and fair dealing. This action was based on this Court's decision in *White v. Unigard Mutual Insurance Co.*, 112 Idaho 94, 730 P.2d 1014 (1986), which was decided in late December 1986.

By February 1987, the contractor who was reconstructing the building had exhausted the funds paid by Transamerica. To that point, the Garnetts had paid the contractor $227,354.73. The contractor estimated that it would require approximately another $77,000.00 to complete the rebuilding and that the job could be finished in about thirty days.

In March 1987, Transamerica wrote to the Garnetts' attorney stating: "It has come to our attention that our insured and your client, Richard Garnett has completed the repairs to his building from the Replacement Cost funds paid by us. We are therefore closing our building file."

In early April 1987, the Garnetts' attorney wrote to Transamerica stating that the Garnetts had expended all of the monies Transamerica had sent to them for rebuilding their building, but that the Garnetts had not received all the payments to which they were entitled. Throughout the next few months, Transamerica's attorney wrote to the Garnetts attorney three times requesting further information about additional costs of the reconstruction. In October 1987, the Garnetts' attorney wrote to Transamerica's attorney stating:

> The building is not completely repaired as Transamerica has not paid the sums of money owing to the Garnetts under the policy. The Garnetts, because the building has not been completed, have lost thousands of dollars in rent. The bids which Transamerica obtained for the repairs to the building were open ended bids and not valid. The only valid bid was the bid obtained by your insured and that contractor proceeded with the work as far as the money would go.

It does little or no good to tell you the claims of the Garnetts because your firm simply ignores them and has the opinion that they dictate what if any is paid. It is totally unfair for an insurance company to hire a lawyer to take over the adjusting of the claim.

No further payments were made by Transamerica prior to the trial in June 1988. During the trial, an expert witness testified on behalf of the Garnetts that he had examined the claims file furnished to him by Transamerica concerning the fire loss of the Garnetts. In describing the file he said:

> This has got to be about the most woeful, inadequate, screwed up file I ever saw in my life if this is all the claim file is. To have this kind of a file in this kind of a claim and to tell me that this is the claim file is ridiculous, it's outrageous, it's just unbelievable.

This witness gave his opinion that "this file constitutes an extreme deviation of the standard of care in claims handling in this part of the country at this time." It appears that the letters between the attorney for the Garnetts and the attorneys for Transamerica were not included in the Transamerica claims file. On cross-examination, the witness testified that he would not expect to find any correspondence between attorneys in the claims file.

The trial court denied Transamerica's motions for a directed verdict on the issues of breach of the covenant of good faith and fair dealing and the award of punitive damages.

The jury awarded the Garnetts (1) $73,458.00 as damages against Transamerica for breach of its contract of insurance, (2) $60,000.00 as damages for breach of the covenant of good faith and fair dealing in the handling of the Garnetts' insurance claim, and (3) $100,000.00 as punitive damages. The trial court denied Transamerica's motions for judgment n.o.v. or for a new trial and awarded the Garnetts attorneys fees. Transamerica then filed this appeal.

## II.

## PAYMENTS FOR REPAIR OR REPLACEMENT.

Transamerica asserts that the trial court should not have allowed the jury to decide whether the Garnetts were entitled to payments for the repair or replacement of the building before they had provided Transamerica with notice of the completion of the work and adequately documented the costs. Transamerica also contends that there was not sufficient evidence presented by the Garnetts to allow the issue of Transamerica's breach of contract to be presented to the jury. The essence of Transamerica's position is that the effect of two clauses of the insurance policy should have been decided as a matter of law by the trial court, rather than leaving the question for the jury to resolve. Transamerica argues that the failure of the trial court to do so tainted the entire verdict. We disagree.

The first clause invoked by Transamerica is one of the general conditions of the policy:

> 9. Duties Of The Named Insured After A Loss. In case of loss the named insured shall:
>
> . . . .
>
> (e) submit to the Company within 60 days after requested a signed, sworn statement of loss that sets forth to the best of the named insured's knowledge and belief:
>
> . . . .
>
> (5) specifications of any damaged building and detailed estimates for repair of the damages;
>
> . . . .

The second clause is part of the "Value Pacer Endorsement:"

> In consideration of the premium charged, it is agreed that coverage under this policy shall apply without limit of liability to provide replacement cost insurance to the building described above and defined elsewhere in this policy, and without application of the coinsurance clause in this policy, subject to the following provisions:
>
> . . . .

3. The Company shall not be liable under this endorsement for any loss unless and until the property is actually repaired or replaced by the insured with due diligence and dispatch.

The trial court instructed the jury concerning these two clauses:

INSTRUCTION NO. 15

An insurance company is entitled to demand that the insured perform all the duties required of him under the contract of insurance. There is nothing unreasonable or improper about an insurance company demanding compliance with the contract it has entered into with its insured.

There can be no liability on the part of defendant Transamerica for simply requiring that plaintiffs fulfill their contractual obligations relating to proof of loss and reconstruction of the insured building.

This instruction implicitly assumes that the two clauses of the policy invoked by Transamerica state duties that the Garnetts were obligated to fulfill under the policy. The only question presented for our consideration is whether there was substantial evidence to justify submitting the case to the jury. If not, the trial court should have granted a directed verdict for Transamerica. For the purpose of this determination, Transamerica admits the truth of the adverse evidence and every inference that may be legitimately drawn from it. I.R.C.P. 50(a) (1987); *Smith v. Great Basin Grain Co.*, 98 Idaho 266, 274, 561 P.2d 1299, 1307 (1977). In reviewing the decision of the trial court not to grant a directed verdict, we apply this same standard and do not defer to the views of the trial court. *Quick v. Crane*, 111 Idaho 759, 764, 727 P.2d 1187, 1192 (1986).

We start our analysis by noting that the two clauses in issue should be read in conjunction with another clause in the endorsement:

5. Should the insured elect not to repair or replace the property after a loss, coverage under this policy shall be limited to the Actual Cash Value of the property at the time of the loss.

■ With regard to the duty of the Garnetts to provide Transamerica specifications of the building and a detailed estimate of the cost of the repairs within sixty days after Transamerica's request, there is evidence upon which the jury could have concluded that the Garnetts did not violate this requirement. Under the policy, payment for damage to the building is limited to its actual cash value, unless the building is repaired and the cost of repair or replacement is greater than the actual cash value. If the cost of reconstructing the building was greater than the actual cash value, there was no purpose in the Garnetts furnishing the specifications of the building and a detailed estimate of the cost of repairs. They were entitled to at least the actual cash value. Whether they were entitled to more would depend on the actual cost of reconstruction.

Here, there is evidence that the Garnetts intended to repair or replace the building. Transamerica's own estimates of the cost of repairing or replacing the building exceeded the actual cash value of the building. From this evidence, the jury could have concluded that the Garnetts did not violate their duty under the policy to furnish specifications of the building and detailed estimates for repair of the damages, since any additional amount to which the Garnetts were entitled under the policy did not depend on the estimate of the cost of repairs, but on the actual cost of repairs.

■ The more difficult question is whether the policy required the Garnetts to repair or replace the building at their own expense before being entitled to more than the actual cash value of the building. A literal reading of the value pacer endorsement might lead to that conclusion. However, the evidence indicates that even Transamerica did not interpret the endorsement this way. In February 1986, Transamerica paid the Garnetts $122,500.00 as the actual cash value of the building. Later that same month, Transamerica told the Garnetts that Transamerica was prepared to make proportional payments toward the repair of the building after the $122,500.00

had been spent and additional repairs were completed. In November 1986, before any of the repairs had been commenced, Transamerica paid the Garnetts an additional amount of $105,630.43 toward the repair of the building. This total of $228,130.43 that Transamerica paid for the repair or the building was approximately equal to the $227,354.73 that the Garnetts paid to the contractor who was reconstructing the building. However, as of February 1987, the contractor had billed the Garnetts for more than $8,000.00 for additional work on the reconstruction. In addition, the contractor was owed a holdback on the amount due of more than $4,000.00. The balance of the work to complete the reconstruction of the building, as it stood at the time of trial, was done at the expense of the Garnetts themselves. Richard Garnett testified at trial that he estimated $20,000.00 work remained to be done to complete the reconstruction of the building.

From this evidence, the jury could have concluded that Transamerica did not fulfill its commitment to make proportional payments toward the cost of repairing the building as the work was completed after the payments made by Transamerica had been exhausted.

### III.

### PAYMENTS FOR IMPROVEMENTS.

■ Transamerica asserts that the trial court should not have allowed the jury to determine whether the Garnetts were entitled to payments for improvements to the building made during the reconstruction that were required by the local building code. We disagree.

Transamerica premises this contention on the portion of the policy that excludes coverage for "[l]oss occasioned directly or indirectly by enforcement of any ordinance or law regulating the use, construction, repair, or demolition of buildings or structures." As we read this provision, it does not limit Transamerica's obligation for the cost of repair or replacement of the building when a loss has occurred that is covered by the policy, but merely states that if

the loss itself is caused by an ordinance or law, there is no coverage. For instance, if some safety improvement of a building to which no other loss had occurred were required by an ordinance or law, Transamerica would not be liable. However, when the cost of repairing or replacing a building that had been damaged by fire is increased by the requirements of an ordinance or law, Transamerica is not relieved of that cost.

### IV.

### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING.

■ Transamerica asserts that the trial court should have dismissed the Garnetts' claim for breach of the covenant of good faith and fair dealing. We disagree.

This Court has held that "where an insurer 'intentionally and unreasonably denies or delays payment' on a claim, and in the process harms the claimant in such a way not fully compensable at contract, the claimant can bring an action in tort to recover for the harm done." *White v. Unigard Mut. Ins. Co.*, 112 Idaho 94, 98, 730 P.2d 1014, 1018 (1986) (footnote omitted). In answering a certified question from the United States District Court for the District of Idaho in *White* we said:

> Of course the mere failure to immediately settle what later proves to be a valid claim does not of itself establish "bad faith." ... [T]he insured must show the insurer "intentionally and unreasonably denies or delays payment...." An insurer does not act in bad faith when it challenges the validity of a "fairly debatable" claim, or when its delay results from honest mistakes.

*Id.* at 100, 730 P.2d at 1020 (citations omitted).

Transamerica moved for a directed verdict at the conclusion of the Garnetts' case and for a judgment n.o.v. after the verdict. The standard by which the trial court is to consider each of these motions is the same. Transamerica admits the truth of the adverse evidence and every inference that

may be legitimately drawn from that evidence. " 'Neither motion should be granted if there is substantial evidence to justify submitting the case to the jury or to support the verdict once it has been returned.' " *Smith v. Great Basin Grain Co.*, 98 Idaho at 274, 561 P.2d at 1307 (quoting *Barlow v. International Harvester, Co.*, 95 Idaho 881, 886, 522 P.2d 1102, 1107 (1974)). In reviewing the trial court's denial of the motions, we are to apply the same standard without special deference to the views of the trial court. *Quick v. Crane*, 111 Idaho at 764, 727 P.2d at 1192.

Our review of the evidence here brings us to the conclusion that the issue of Transamerica's breach of the covenant of good faith and fair dealing was properly presented to the jury. The most specific evidence presented by the Garnetts on this question was the testimony of the insurance expert who testified that Transamerica's claims file was "an extreme deviation of the standard of care in claims handling in this part of the country at this time." While the record indicates that the correspondence between the attorneys for the parties was not included by Transamerica in the file furnished to the expert witness, the implication of that evidence was for the jury to consider and is not properly considered on Transamerica's motions.

There is additional evidence indicating that Transamerica may have intentionally and unreasonably denied or delayed payment on the claim of the Garnetts that harmed the Garnetts in a way not fully compensable at contract. Most damaging was the evidence that after November 1986, Transamerica continued to insist upon completion of the reconstruction of the building before more payments would be made to the Garnetts, despite the fact that Transamerica's claims adjuster had represented to the Garnetts in February 1986 that the company stood ready to make proportional payments toward the cost of repair after the actual cash value had been spent and additional repairs completed. Although an additional payment exceeding $105,000.00 was made in November 1986, Transamerica made no further payments after that, despite the fact that additional amounts were due to the contractor employed by the Garnetts to reconstruct the building and despite the fact that the Garnetts themselves continued to work on the building after the contractor terminated his work because of lack of funds.

While Transamerica presented some evidence in explanation of its failure to make further payments, it is not appropriate for us, nor was it appropriate for the trial court, to weigh this evidence in considering Transamerica's motions. As we said in *Quick*:

> [T]he trial judge must view all of the evidence and all inferences drawn therefrom in favor of the non-moving party, and decide if there was substantial evidence to justify submitting the case to the jury, or, in other words, that there can be but one conclusion as to the verdict that reasonable minds could have reached.

111 Idaho at 764, 727 P.2d at 1192. In our view, reasonable minds could have reached more than one conclusion from the evidence presented by the Garnetts, after every legitimate inference was drawn from it in the light most favorable to the Garnetts. *Id.* at 763, 727 P.2d at 1191.

### V.

### PUNITIVE DAMAGES.

Transamerica asserts that (1) punitive damages were inappropriate in this case, (2) the trial court should have granted Transamerica's motion for judgment n.o.v. and (3) punitive damages are unconstitutional. We disagree.

In *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 905, 665 P.2d 661, 669 (1983) we said:

> An award of punitive damages will be sustained on appeal only when it is shown that the defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct, and that the act was performed by the defendant with an understanding of or disregard for its likely consequences." The justification for punitive damages must

be that the defendant acted with an extremely harmful state of mind, whether that state be termed "malice, oppression, fraud or gross negligence;" "malice, oppression, wantonness;" or simply "deliberate or willful."

(Citations omitted.)

We have limited our role in reviewing the decision of a trial court to allow the jury to consider an award of punitive damages. In *Soria v. Sierra Pacific Airlines, Inc.,* 111 Idaho 594, 611, 726 P.2d 706, 723 (1986), we said: "The decision of whether to submit the question of punitive damages to the trier of fact rests within the discretion of the trial court."

In addressing whether the trial court abused its discretion in allowing the jury to consider punitive damages, both *Cheney* and *Soria* focus on the sufficiency of the evidence to support the jury's award. In upholding the trial court's submission to the jury of the question of punitive damages in *Cheney,* the Court held "that sufficient evidence was placed before the jury to raise the questions of defendants' malice and of whether an award of punitive damages would serve as a deterrent to similar future conduct." 104 Idaho at 905, 665 P.2d at 669. The Court then focused on what the jury "could have reasonably determined." *Id.* Likewise, in *Soria,* the Court held that "the evidence ... justified a jury's award of punitive damages" and that the trial court had not abused its discretion in allowing the jury to consider the issue. 111 Idaho at 612, 726 P.2d at 724.

As we interpret this abuse-of-discretion standard of review set forth in *Cheney* and *Soria,* it is essentially a substantial evidence standard. *See Edmark Motors, Inc. v. Twin Cities Toyota, Inc.,* 111 Idaho 846, 850, 727 P.2d 1274, 1278 (Ct.App.1986) (review denied) ("*Cheney* does not explicitly identify the standard of appellate review governing a decision to award punitive damages. However, our task logically should be to determine whether the record contains substantial evidence to support the jury's implicit finding of circumstances described in *Cheney's* broad guideline.")

Applying these standards to the record before us in this case leads us to the conclusion that the trial court did not abuse its discretion in submitting the issue of punitive damages to the jury. We note again particularly the testimony of the Garnetts' expert insurance witness who described the claims file of Transamerica as "an extreme deviation of the standard of care in claims handling in this part of the country at this time." This testimony is reminiscent of the testimony of the expert witness in *Sliman v. Aluminum Co. of America,* 112 Idaho 277, 731 P.2d 1267 (1986) who described the conduct of the defendant in that case as "an extreme deviation from the customary practice in the industry." *Id.* at 285, 731 P.2d at 1275. In *Sliman,* we held that this expert testimony of "extreme deviation," together with the defendant's knowledge of prior accidents and failure to insure that consumers were warned of the risk supported the jury's finding that the defendant " 'show[ed] a reckless disregard for plaintiff's safety and an extreme deviation from standards of reasonable conduct.' " *Id.* at 286, 731 P.2d at 1276. We held that the trial court did not abuse its discretion in submitting the issue of punitive damages to the jury.

Here, in addition to the expert testimony of extreme deviation from the standard of care in claims handling, there is in the record evidence indicating:

1. Transamerica relied on a bid for the reconstruction of the Garnetts' building that failed to take into account the necessary repair of the heating system. When asked about this at trial, Transamerica's claims representative admitted that the cost of repair of the building represented by this bid was false.

2. Transamerica failed to pay the full cost of the reconstruction of the building, even up to the time of trial, despite repeated efforts of the Garnetts and their attorney.

Transamerica attempts to justify its failure to pay for the completion of the reconstruction of the Garnetts' building on two grounds: (1) The contractor included in his

bid items that were improvements required by the local building code and (2) the Garnetts did not provide Transamerica with detailed specifications concerning the repair showing the extent of the labor, amount of materials or other specific information. Both of these grounds are spurious.

As we have previously discussed, the provision of the policy relied on by Transamerica to attempt to limit payments related to code improvements is inapplicable to this case. The requirements of the code were not the cause of the loss; the requirements only necessitated additional costs in the reconstruction of the building. Transamerica was not justified in invoking this provision as an excuse for not paying for the remaining cost of reconstruction.

As we have also previously discussed, the provision of the policy by which Transamerica insisted on detailed specifications and the cost of the reconstruction was inapplicable to this case. Transamerica itself acknowledged by its payments that the cost of reconstruction would be significantly more than the actual cash value of the building. The general condition of the policy invoked by Transamerica required the Garnetts to furnish "specifications of any damaged building and detailed estimates for repair of the damages." This condition had relevance only if Transamerica believed that the cost of repair would be less than the actual cash value of the building. Once Transamerica acknowledged that the cost of reconstruction would be greater than the actual cash value, Transamerica had the obligation to pay the addition cost under the value pacer endorsement. Although Transamerica had knowledge that the amount it had paid did not allow the reconstruction to be completed, it did not come forward with additional payments. In fact, the record indicates that the claims representative of Transamerica did not even visit the building to verify the status of reconstruction or what remained to be done.

Beginning in November 1986, Transamerica insisted that it was not liable beyond the amounts it had paid until those amounts had been spent on the reconstruction. In March 1987, Transamerica took the position that the Garnetts had completed the repairs to the building. There is nothing in the record to indicate why Transamerica reached this conclusion. Within a matter of days, the Garnetts' attorney advised Transamerica that there were additional replacement costs that had not been paid by the company. Shortly thereafter, Transamerica requested "a breakdown of the claim, showing the nature of the expenditures and the amounts." Similar requests were made in June and October 1987. In October 1987, the Garnetts' attorney advised Transamerica's attorney that the building had not been completely repaired because Transamerica had not paid the amounts owed to the Garnetts under the policy. The Garnetts' attorney referred to the bid that the contractor who undertook the reconstruction had submitted in September 1986. This bid was in the amount of $312,288.74. Despite this bid, Transamerica continued to cling to the adequacy of the payments of less than $230,000.00 it made to the Garnetts for reconstruction of the building.

These circumstances, together with the testimony of the expert insurance witness, constituted substantial evidence for the submission of the question of punitive damages to the jury.

As a final attack on the award of punitive damages, Transamerica has challenged the constitutionality of punitive damages under the eighth amendment to the United States Constitution and under the due process clause of the fourteenth amendment to the United States Constitution. The eighth amendment challenge has been disposed of by the United States Supreme Court in *Browning–Ferris Indus. v. Kelco Disposal, Inc.*, 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). The Supreme Court declined to rule on the due process issue in *Browning–Ferris* because the issue had not been raised in the lower courts and had not been mentioned in the petition for certiorari. However, the Supreme Court did note in passing that "the due process analysis of an award of punitive damages may track closely the Eighth Amendment analysis suggested by petition-

ers." 492 U.S. at ___ n. 23, 109 S.Ct. at 2921 n. 23, 106 L.Ed.2d at 239 n. 23. Here, the issue was preserved in the trial court and has been raised on appeal, and we are, therefore, compelled to address it.

Four members of the Supreme Court indicated by their separate opinions in *Browning–Ferris* that they entertain serious doubts about the constitutionality of punitive damages when juries are given unbridled discretion to impose them. *See* opinions of Justice Brennan, with whom Justice Marshall joined, concurring, and Justice O'Connor, with whom Justice Stevens joined, concurring in part and dissenting in part. 109 S.Ct. at 2923–24, 106 L.Ed.2d at 241–42.

The instruction concerning punitive damages in this case allowed the jury to award "an amount which will, by punishing the defendant TRANSAMERICA INSURANCE SERVICES, serve to deter the Defendant and others from engaging in similar conduct in the future." The operative language of this instruction was taken verbatim from the suggested jury instructions authorized by this Court. Idaho Jury Instruction 921 (1983). Although this instruction may not seem to avoid the unbridled discretion that troubled four members of the Supreme Court in *Browning–Ferris*, this Court has authorized the trial court to grant a judgment n.o.v. or new trial if the award is excessive. As we said in *Cheney*, "punitive damage awards are in the first instance a jury decision, subject to the trial court's authority to modify or overturn that jury verdict as a matter of law." 104 Idaho at 904, 665 P.2d at 668. We believe that any due process problem arising under the fourteenth amendment with the award of punitive damages under an instruction such as was given in this case is cured by the trial court's authority to grant relief from the verdict. Here, after reviewing the verdict, the trial court found the award of punitive damages to be appropriate.

## VI.

### DAMAGES FOR EMOTIONAL DISTRESS.

Transamerica asserts that the trial court should not have allowed the jury to consider damages for emotional distress and that the attorney for the Garnetts should not have been allowed to argue that the Garnetts were entitled to damages for stress. We decline the invitation to address this issue, because the trial court did not instruct the jury to consider emotional distress in awarding damages and because the arguments to the jury have not been presented to us as part of the record on appeal.

Transamerica contends that the trial court instructed the jury that they could consider emotional distress in awarding damages to the Garnetts. This contention is premised on two instructions given to the jury. In the first instruction, the trial court advised the jury of the facts alleged by the Garnetts and concluded by stating that the Garnetts sought to recover from Transamerica various amounts, including damages "for emotional distress suffered by the plaintiffs." However, the trial court also instructed the jury that the statements of the claims of the parties were given to acquaint the jury with the issues to be decided in the case and were not evidence.

The second instruction invoked by Transamerica instructed the jury that they need consider the issue of damages only if they found legal liability on the part of Transamerica. The instruction then outlined the two theories of liability in the case—breach of contract and breach of an implied covenant of good faith and fair dealing. The instruction included the statement: "You are instructed that the Plaintiffs seek recovery under both of these theories or doctrines of liability, and, therefore, the jury may consider each theory with respect to the issue of liability." Transamerica argues that this instruction combined with the instruction stating that the Garnetts sought to recover for emotional distress amounted to an instruction that the jury could consider and award damages for emotional distress. We disagree.

The instruction authorizing the jury to consider each theory with respect to the issue of liability did not direct them in the

award of damages. The instruction stating the claims of the Garnetts did not authorize the jury to award damages for emotional distress. The operative instructions on the question of damages state that the Garnetts had the burden of proving the "nature and amount of damages" they suffered. Another instruction stated that if the jury decided that the Garnetts had proved breach of contract by Transamerica, the jury should fix the amount of money that would reasonably and fairly compensate them. In the instruction advising the jury how to determine damages if they decided that Transamerica had breached the duty of good faith and fair dealing, the trial court said the jury should fix the amount of money that would reasonably and fairly compensate the Garnetts "for all actual detriment proximately caused by the defendants' wrongful conduct, if such damages have been proved by the evidence to have been proximately caused by such breach." In the instruction advising the jury how to determine punitive damages, the trial court advised the jury that they might award damages in an amount that would serve to deter Transamerica and others from engaging in similar conduct in the future. We do not view any of these instructions as authorizing the jury to award damages for emotional distress. Therefore, we will not address the propriety of an instruction advising the jury that they might award damages for emotional distress.

Since we do not have the final arguments of counsel in the record before us, we decline the invitation of Transamerica to rule on the propriety of any arguments by the attorney for Garnetts concerning the award of damages for stress.

## VII.

### ATTORNEY FEES AWARDED BY THE TRIAL COURT.

Transamerica asserts that attorney fees should not have been awarded by the trial court, since the jury had already awarded attorney fees as part of the punitive damages and since the Garnetts' attorney did not provide sufficient documentation to support the award. We disagree.

█ In awarding attorney fees to the Garnetts, the trial court noted that the relationship of attorney fees to punitive damages has had a tortured history in this state. The trial court concluded that the more recent cases make it uncertain whether attorney fees must be included in punitive damages, but make it clear that attorney fees and other costs of litigation may be included. The jury was not instructed to include attorney fees in the award of punitive damages in this case. The trial court ruled that the $100,000.00 award of punitive damages was not disproportionate to the $133,458.00 award of compensatory damages, and therefore concluded that the award of punitive damages did not include attorney fees. The trial court awarded attorney fees under both I.C. § 41–1839(1) and I.R.C.P. 54(e).

Today, we hold that in a case involving a claim against an insurance company for failure to pay an amount due under a policy, attorney fees may be awarded under I.C. § 41–1839(1), unless the jury has been specifically instructed to include attorney fees in any award of punitive damages or unless the trial court concludes that the award of punitive damages was so disproportionate that it included attorney fees.

█ As to the documentation of the amount of attorney fees awarded, the trial court had a memorandum of costs submitted by the Garnetts' attorney that included the number of hours expended by the attorney and an associate and the hourly rate used to calculate the total fee. While there was evidence offered by Transamerica that the hourly rate for the Garnetts' attorney exceeded the usual rate in the local area, the trial court considered the factors listed in I.R.C.P. 54(e)(3), especially the expertise of the attorney in prosecuting claims against insurance companies. The trial court was within its discretion in the award of attorney fees.

## VIII.

### CONCLUSION.

We affirm the judgment, the denial of Transamerica's motions for directed verdict

and judgment n.o.v. and from the order awarding the Garnetts attorney fees.

We award costs on appeal to the Garnetts. We award no attorney fees on appeal.

BISTLINE, BOYLE and McDEVITT, JJ., concur.

BAKES, Chief Justice, dissenting:

The issue addressed in Part II of the majority opinion is framed as follows: .

> Was the trial court correct in allowing the jury to decide whether the insureds (the Garnetts) were entitled to payments from the insurance company (Transamerica) for repair or replacement of the damaged property *before the Garnetts completed the reconstruction and documented the cost?*

*Ante* at 771, 800 P.2d at 658 (emphasis added). In analyzing this issue, the first task is to determine whether the provisions of the policy are ambiguous and, if not, what the policy required of Transamerica. It is a principle firmly established in our case law that, where the provisions of an insurance policy are unambiguous, the interpretation of those provisions is a question of law for the court. *See, e.g., Casey v. Highlands Ins. Co.*, 100 Idaho 505, 600 P.2d 1387 (1979); *Parma Seed, Inc. v. General Insurance Co. of America*, 94 Idaho 658, 496 P.2d 281 (1972); *Unigard Ins. Group v. Royal Globe, etc.*, 100 Idaho 123, 594 P.2d 633 (1979).

The majority fails to answer this important first question concerning whether the pertinent provisions of this policy are ambiguous. As noted by the majority, there are two crucial provisions of the policy. The first reads:

> 9. **Duties Of The Named Insured After A Loss.** In case of loss the named insured shall ...
>
> (e) submit to the Company within 60 days after requested a signed, sworn statement of loss that sets forth to the best of the named insured's knowledge and belief:
>
> . . . .

> (5) specifications of any damaged building and detailed estimates for repair of the damages;
>
> . . . .

The second relevant provision states:

> 3. The Company shall not be liable under this endorsement for any loss *unless and until the property is actually repaired* or replaced by the insured with due diligence and dispatch.

(Emphasis added.) Both of these provisions are straightforward and concise. Neither provision can fairly be described as ambiguous, and neither the trial court below nor the majority on appeal concludes that these two provisions are ambiguous. Accordingly, the trial court should have instructed the jury as to the specific meaning and effect of those provisions, *i.e.*, that the insured had an obligation under the contract to furnish those proofs of loss and detailed estimates for repair of the damages and that Transamerica was not liable for any payment unless and "until the property is actually repaired." Instead of providing such instructions, the trial court merely instructed the jury that, "There is nothing unreasonable or improper about an insurance company demanding compliance with the contract it has entered into with its insured. There can be no liability on the part of defendant Transamerica for simply requiring that plaintiffs fulfill their contractual obligations relating to proof of loss and reconstruction of the insured building." With respect to this instruction, the majority states, "This instruction implicitly assumes that the two clauses of the policy invoked by Transamerica state duties that the Garnetts were obligated to fulfill under the policy. The only question presented for our consideration is whether there was substantial evidence to justify submitting the case to the jury." *Ante* at 778, 800 P.2d at 665. However, instructing the jury that Transamerica could not be held liable for requiring the plaintiffs to fulfill their contractual obligations is a far cry from the instructions that Transamerica was entitled to. Transamerica was entitled to an instruction that no liability could be imposed upon Transamerica unless the insured submitted to the company

proofs of loss within 60 days and "until the property is actually repaired or replaced by the insured with due diligence and dispatch." If the plaintiff did not prove that it submitted its proofs of loss within sixty days as required by the policy, or did not prove that it had actually repaired the premises, then Transamerica was entitled to a directed verdict.

The two clauses of the insurance policy— Clause 9 requiring the submission of the "specifications of any damaged building and detailed estimates for repair of the damages," and Clause 3 of the "Value Pacer Endorsement" providing that "the company shall not be liable under this endorsement for any loss unless and until the property is actually repaired or replaced by the insured with due diligence and dispatch"—are clear and unambiguous. The Court's opinion does not conclude otherwise. The trial court initially, and this Court on appeal, should enforce them as written. Nevertheless, the Court chooses not to enforce them. The reason the Court gives for not enforcing the policy requirement that the Garnetts submit sworn statements as to proof of damage and estimate of repair is that "there was no purpose in the Garnetts furnishing the specifications of the building and detailed estimate of cost of repairs." *Ante* at 778, 800 P.2d at 665. As to the policy provision that the company shall not be liable for any loss until the property is actually repaired, the Court's reason for not enforcing that policy provision is the statement that, while "[a] literal reading of the value pacer endorsement might lead to that conclusion ... the evidence indicates that even Transamerica did not interpret the endorsement this way." *Ante* at 778, 800 P.2d at 665. I believe the Court errs in its analysis when it finds "no purpose" in enforcing the first provision, and further errs in excusing compliance with the second because it concludes that "Transamerica did not interpret the endorsement this way."

As we stated in *Miller v. World Ins. Co.,* 76 Idaho 355, 283 P.2d 581 (1955):

It is the function of the court to construe a contract of insurance as it is written, and the court by construction cannot create a liability not assumed by the insurer, nor make a new contract for the parties, or one different from that plainly intended, nor add words to the contract of insurance to either create or avoid liability.

76 Idaho at 357, 283 P.2d at 582. In my opinion, the majority has effectively rewritten the contract for the parties in this case by describing the duties in that contract either as "without purpose," or that "Transamerica did not interpret the endorsement this way." It has thus not followed the requirement articulated in our cases that the Court cannot create a liability not assumed, or make a new contract for the parties.

With respect to the first provision, the Court elaborates on its conclusion that "there was no purpose in the Garnetts furnishing the specifications of the building and a detailed estimate of the cost of repairs" to Transamerica as required by the policy, by stating:

Under the policy, payment for damage to the building is limited to its actual cash value, unless the building is repaired and the cost of repair or replacement is greater than the actual cash value. If the cost of reconstructing the building were greater than the actual cash value, there was no purpose in the Garnetts furnishing the specifications of the building and a detailed estimate of the cost of repairs. They were entitled to at least the actual cost value. Whether they were entitled to more would depend on the actual cost of reconstruction.

Here, there is evidence that the Garnetts intended to repair or replace the building. Transamerica's own estimates of the cost of repairing or replacing the building exceeded the actual cash value of the building. From this evidence the jury could have concluded that the Garnetts did not violate their duty under the policy to furnish specifications of the building and detailed estimates for repair of the damages, since any additional amount to which the Garnetts were entitled under the policy did not depend on the estimate

of the cost of repairs, but on the actual cost of repairs.

Merely because Transamerica's own estimates of the cost of repairing or replacing the building exceeded the actual cash value of the building did not excuse the Garnetts from complying with the requirement of the policy that they submit those proofs of loss within sixty days. The Court's statement that, "From this evidence the jury could have concluded that the Garnetts did not violate their duty under the policy ..." is not a reference to evidence in the record at all, but rather the Court's excusing the Garnetts' performance under the policy because the Court finds "there was no purpose in the Garnetts furnishing the specifications...." I believe the Court errs when it concludes that the jury was properly instructed on this issue and that there was evidence from which the jury could have concluded that the Garnetts did not violate their duty under the policy to submit proofs of loss.

As to the second provision in the contract, the provision in the Value Pacer Endorsement that "the company shall not be liable under this endorsement for any loss unless and until the property is actually repaired ...," the majority states:

> The more difficult question is whether the policy required the Garnetts to repair or replace the building at their own expense before being entitled to more than the actual cash value of the building. *A literal reading of the Value Pacer Endorsement might lead to that conclusion. However, the evidence indicates that even Transamerica did not interpret the endorsement this way.*

*Ante* at 778, 800 P.2d at 665 (emphasis added). In actuality, there is simply no evidence on this record to suggest that Transamerica interpreted their policy other than exactly as it was written. From beginning to end, Transamerica has interpreted the policy in only one way, *i.e.*, literally. Transamerica's position before, during, and after trial is that they were not required to make payments "unless and until repairs were actually complete." That is the only interpretation that Transamerica has ever given to this policy, and that is the interpretation that the evidence on this record supports.

The "evidence" referred to and relied upon by the majority to support its conclusion is (1) a letter from Transamerica in which a claims adjuster stated that Transamerica was willing to make proportional payments toward the repair of the building after the $122,500 had been spent and additional repairs were completed; and (2) the fact that Transamerica actually paid $105,-630.43 toward the repair of the building. This evidence in no way suggests that Transamerica interpreted the policy as requiring them to make payments before repairs were complete. Merely because Transamerica volunteered to make progress payments in advance of the completion of the repairs, does not mean that they believe they were required to do so. In fact, the record shows that Transamerica did everything within its power to ensure that their position—their interpretation of the policy—would not be misconstrued. When writing to the Garnetts explaining how the interim payment had been determined by the company, Transamerica's attorney ended that correspondence by stating, "Finally, Transamerica continues to reserve all rights and defenses under its policy. No waiver or estoppel is intended, nor should be implied." I believe the Court errs egregiously when it makes an appellate finding of fact that, "Even Transamerica did not interpret the endorsement this way."

For Transamerica to have been bound to a "commitment" to make proportional payments, in the face of the unambiguous policy provision providing that it did not have to make any payments "until the property is actually repaired," there would have to be a separate independent agreement between the parties supported by an additional consideration in order for there to be a binding contract or commitment to make proportional payments toward the cost of repairing the building as the work was completed. *Brand S Corp. v. King*, 102 Idaho 731, 639 P.2d 429 (1981); *Massey–Ferguson Credit Corp. v. Peterson*, 102 Idaho 111, 626 P.2d 767 (1981). No such

agreement and consideration was alleged or proved, and the Court's opinion points to none.

The record in this case shows that some interim payments were made for the repairs to the building. In addition to the $122,500 payment, which would have been the minimum amount due under the policy, being the actual cash value, Transamerica advanced an additional $105,630.43 toward the repair of the building, even in advance of those repairs being made. As the factual statement in the majority opinion demonstrates, at the time that Garnetts filed this lawsuit, and even at the time of trial, Richard Garnett testified that approximately $20,000 worth of work remained to be done to complete the reconstruction of the building. Under the clear and unambiguous provisions of the policy, Transamerica was not required to make any payment "until the property is actually repaired." The mere fact that Transamerica attempted to accommodate the Garnetts' needs by making proportional payments at or before the time the repairs were completed cannot constitute a binding modification of the policy to include a new "commitment" by Transamerica to pay prior to the time that the repairs were actually completed. There is no evidence of such an agreement, and there would be no consideration for it even if there were. Each of Transamerica's letters expressly negated any such modification. If insurance companies are going to be penalized for advancing payments sooner than required under their policies, as has occurred here, then the natural effect of today's decision will be to discourage insurance companies from making payments in advance of what would otherwise be required under a policy. That result will certainly be counterproductive to all insureds in the future.

In sum, the majority's statement that "from this evidence the jury could have concluded that Transamerica did not fulfill its commitment to make proportional payments toward the cost of repairing the building as the work was completed," is simply unsupported by the law or the facts. Further, it is unclear what the majority means by such a "commitment." Does the Court mean a modification of the insurance contract? If so, it would be invalid as a modification because there was no agreement to such a modification by Transamerica, and Garnetts provided no consideration for such an early payment modification. Does the Court mean a waiver? If so, then the Court's conclusion is incorrect because the correspondence forwarding the advance payments provided that "the insurance company continues to insist upon full and complete compliance with all of the terms and conditions of the policy of insurance and ... [n]o waiver or estoppel of any kind is intended or should be inferred from this letter." Finally, as a factual matter, the Court's opinion itself acknowledges that Transamerica made some payments before the work was completed. There is no factual or legal basis for a jury to find that a legal "commitment" was not fulfilled. All the evidence on the record—including that relied on by the majority—demonstrates that Transamerica made payments before they were required by the policy. The trial court should have granted Transamerica's motion for j.n.o.v.

II

With regard to Part V of the majority opinion, and its treatment of the punitive damage issue, the majority sets out the standard for an award of punitive damages articulated in *Cheney v. Palos Verdes Inv. Corp.*, 104 Idaho 897, 665 P.2d 661 (1983). The majority also notes that "the decision of whether to submit the question of punitive damages to the trier of fact rests within the discretion of the trial court." *Quoting Soria v. Sierra Pacific Airlines, Inc.*, 111 Idaho 594, 726 P.2d 706 (1986). The majority ultimately concludes that "applying these standards to the record in this case leads to the conclusion that the trial court did not abuse its discretion in submitting the issue of punitive damages to the jury." *Ante* at 781, 800 P.2d at 668.

The evidence in this case simply does not reach the necessary threshold to warrant the submission of a punitive damage award to the jury. In order to assert a punitive damage claim, a plaintiff must meet a cer-

tain threshold by demonstrating that a defendant acted in a manner that was "an extreme deviation from reasonable standards of conduct," or "acted with an extremely harmful state of mind, whether that state of mind be termed 'malice, oppression, fraud or gross negligence ...'" *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 665 P.2d 661 (1983). In support of its conclusion that the evidence reached that threshold, the majority relies on (1) Transamerica's failure to pay the full cost of reconstruction prior to completion of the building; and (2) the fact that Transamerica relied on a bid for the reconstruction of the building that failed to take into account the repair of the heating system; and (3) the testimony of Garnett's expert witness. In my opinion, all three of these reasons fall far short of the standards articulated in *Cheney.*

Regarding the first, Transamerica's failure to pay the cost of reconstruction prior to completion, the clear and unambiguous provisions of the policy did not require payment "unless and until reconstruction was actually completed." How can the claim that Transamerica failed to make payments before they were due under the policy be evidence to support a punitive damage award? In any event, as pointed out in Part I, Transamerica did make proportional payments even before the repairs were actually completed. There is simply no basis for claiming punitive damages based on the failure of Transamerica "to pay the full cost of reconstruction prior to completion of the building," when the policy didn't require it.

Regarding the second claim that Transamerica relied on an estimate that did not take into account the cost of the heating system, there was no obligation on the part of Transamerica to obtain any bid or estimate under the insurance contract—that obligation was on the Garnetts under Paragraph 9 of the policy, as pointed out on page 13 of the Court's opinion. The Court has excused the Garnetts' failure to comply with Paragraph 9's requirement that the insured submit a bid within sixty days by stating, "There was no purpose in the Garnetts furnishing the specifications of the

building and a detailed estimate of the cost of the repairs." If the Garnetts can be excused from performing their policy obligation to obtain "specifications of any damaged building and detailed estimates for repair of the damages" because it served "no purpose," how can Transamerica, which had no such obligation under the policy, be guilty of "an extreme deviation from reasonable standards of conduct" by obtaining an estimate which did not include repair to the heating system when it had no obligation to provide such an estimate or bid? Further, the Garnetts themselves relied on that Transamerica estimate which they presented to the City of Coeur d'Alene in order to establish that the building would meet the applicable zoning and building code in order to obtain a permit to rebuild the building. The Garnetts made no objection to the Transamerica estimate when they were using it to get their building permit. It is difficult to believe that the omission of one item in a complex bid (even if the omission could be found to be negligent), could ultimately provide the basis for a punitive damage award of $100,000. If, as the Court's opinion suggests, the Garnetts can be excused from their contract obligation to submit estimates within sixty days because those estimates would serve "no purpose" because the Garnetts were entitled to the actual cost of repair, how then can Transamerica be faulted for obtaining an estimate which did not cover one item, when Transamerica had no duty to obtain any estimate? That circumstance cannot be evidence supporting a claim for punitive damages. With respect to the majority's treatment of the expert testimony, that testimony lends absolutely no support to the award of punitive damages. Here, the expert testified that the *claims file* of Transamerica was an extreme deviation from the reasonable standard of conduct. As the majority opinion observes,

> This witness gave his opinion that "this file constitutes an extreme deviation of the standard of care in claims handling in this part of the country at this time." It appears that the letters between the at-

torney for the Garnetts and the attorneys for Transamerica were not included in the Transamerica claims file. On cross examination the witness testified that he would expect to find any correspondence between attorneys in the claims file. *Ante* at 777, 800 P.2d at 664. However, to recover punitive damages for denial of an insurance claim, the insured must show (1) "that the company initially refused to pay a valid claim, (2) *that the company's refusal to make prompt payment was an extreme deviation from reasonable standards of conduct,* and (3) that this extreme deviation occurred with an understanding of the probable consequences." *Greene v. Truck Ins. Exchange,* 114 Idaho 63, 753 P.2d 274 (Ct.App.1988), *review den.,* 116 Idaho 467, 776 P.2d 829 (1989). Here, the expert *did not* testify or even intimate that there was a "refusal to make prompt payment" by Transamerica which was an extreme deviation from the reasonable standard of conduct. Nor did the expert testify that the incompleteness of the "claims file" was in any way responsible for any claimed refusal by Transamerica to make prompt payment. This expert merely testified that, because the claims file did not contain the attorneys' correspondence, that file was "ridiculous, it's outrageous, it's just unbelievable." Without some showing that the incompleteness of this claims file contributed to some failure by Transamerica to pay money which was due under the policy, the expert's opinion was totally irrelevant.

The irrelevance of this expert's testimony to an award of punitive damages cannot be over-emphasized. The *claims file* was not on trial; rather, it was Transamerica's conduct in allegedly failing to pay when the policy required it to pay which is on trial. However, the plaintiff in this case has failed to prove that Transamerica did not make prompt payments as they were due under the policy. Under Paragraph 3 of the Value Pacer Endorsement, Trans-

america was not "liable under [that] endorsement for any loss unless and until the property is actually repaired or replaced by the insured. . . ." *Ante* at 779, 800 P.2d at 666. Richard Garnett testified at trial that he estimated $20,000 worth of work remained to be done to complete the reconstruction of the building. Accordingly, under the Value Pacer clause, Transamerica had not breached its policy, and the omission in the claims file of the attorneys' correspondence has no bearing on the question of whether Transamerica had breached its policy by failing to pay the claim under the policy when it became due. The expert's opinion that Transamerica's claims file was "ridiculous, it's outrageous, it's just unbelievable," because it didn't include the attorney correspondence was totally irrelevant to the issues.

The majority opinion cites the case of *Sliman v. Aluminum Company of America,* 112 Idaho 277, 731 P.2d 1267 (1986), in support of its approval of the expert testimony in this case to uphold the award of punitive damages. The majority opinion states, "This testimony is reminiscent of the testimony of the expert witness in *Sliman v. Aluminum Company of America,* ..., who described the conduct of the defendant in that case as 'an extreme deviation from the customary practice in the industry.'" *Ante* at 781, 800 P.2d at 668. While in both cases the expert uttered the phrase "extreme deviation from the reasonable standard of care," beyond that the similarities end. In *Sliman,* the plaintiff sued the defendant manufacturer for injuries she sustained from the use of defendant's product, a 7–Up bottle with an aluminum twist-off cap.[1] The plaintiff's primary complaint in *Sliman* was that the defendant failed to warn of the risk inherent in the use of its product. At trial the expert was asked if he had an opinion as to whether the failure of the defendant AL-COA to warn was an extreme deviation from the customary and usual action taken

---

1. In *Sliman,* the plaintiff attempted to open a plastic bottle of 7–Up. The bottle was capped with an aluminum twist-off cap. Neither the cap nor the bottle contained any warnings concerning the possibility of the cap blowing off, or any instructions on how to remove the cap. Believing that the pilfer-proof band at the bot-

tom of the cap must be removed before removing the cap itself, the plaintiff pulled at the band with a pair of pliers. At this point, the cap exploded from the bottle and struck her in the left eye, causing permanent injury and loss of sight in that eye.

by manufacturers of consumer products. In response to that question, the expert testified:

> A. It's my opinion that *the failure to correct this problem, or to warn, at least warn the public about it, is an extreme deviation from the customary practice in the industry.*

112 Idaho at 285, 731 P.2d at 1275 (emphasis added).

As is evident from the underscored language, the expert's testimony in *Sliman* related directly to the defendant's alleged tortious conduct at issue (failure to warn), which was the proximate cause of the plaintiff's claim (injury from use of the product). It was that conduct of the defendant which caused the injury that the expert described as an extreme deviation from the reasonable standard of care. In this case the conduct of Transamerica which was at issue was whether Transamerica had breached its policy by failure to make payments before the repairs were actually completed. Garnetts had not alleged a cause of action against Transamerica for breaching its policy by failure to maintain the correspondence of the lawyers in its claim file, or any other deficiency in the claims file. Their claim was that Transamerica had failed to pay money when it was due under the policy. Nothing in the insurance contract imposed any duty on Transamerica to even maintain a claims file. There was no evidence from the expert witness, or anyone else, that if Transamerica had maintained a proper claims file it would not have breached its policy and would have paid money sooner than it did. In fact, the Garnetts' own evidence shows just the contrary—that there was no money due under the policy because the property had not been "actually repaired" as required by Paragraph 3 of the Value Pacer Endorsement to the policy. The expert witness's testimony in this case was unrelated to the plaintiffs' claim that the defendant Transamerica had failed to pay money when it was due under the policy and was totally irrelevant.

We have on numerous occasions reiterated the principle that the ultimate justification for punitive damages is that the defendant acted with an extremely harmful state of mind, whether that state of mind be called malice, oppression, fraud or gross negligence. *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 665 P.2d 661 (1983). We have also indicated that the purpose of punitive damages is deterrence, not punishment. *See, e.g., Sliman v. Aluminum Company of America,* 112 Idaho 277, 731 P.2d 1267 (1986); *Cheney v. Palos Verdes Investment Corp.,* 104 Idaho 897, 665 P.2d 661 (1983); *Morrison v. Quality Product, Inc.,* 92 Idaho 448, 444 P.2d 409 (1968). After reviewing the record and briefs in this case, there is no evidence that Transamerica even breached its contract, much less did so with the "extremely harmful state of mind" required by our cases to establish a punitive damage claim. In the correspondence between the attorneys, Transamerica offered to pay money prior to when it would otherwise have been required to pay it under the policy, all the time asserting that it was not waiving its rights under the policy by making those payments in advance of when it was obligated to make them under the policy. I find it incomprehensible that the Court finds that Transamerica's actions in this case meets the substantial threshold which we have required a claimant to meet before the issue of punitive damages can even be submitted to a jury. The award of punitive damages in this case should be set aside.