Jerry and Becky **FRENCH,**
Appellants–Plaintiffs,

v.

**STATE FARM FIRE & CASUALTY COMPANY and Jane Hodson,**
Appellees–Defendants.

No. 18A02–0612–CV–1161.

Court of Appeals of Indiana.

March 6, 2008.

George M. Plews, Todd J. Janzen, Plews Shadley Racher & Braun LLP Indianapolis, IN, Attorneys for Appellants.

Karl L. Mulvaney, Dennis F. Cantrell, Tara Stapleton Lutes, Bingham McHale LLP, Indianapolis, IN, Attorneys for Appellees.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Jerry and Becky French (the "Frenches") appeal from the trial court's order granting summary judgment in favor of Jane Hodson on the Frenches' claim of negligent advice and procurement of insurance. The Frenches raise three issues for our review, which we restate as whether the trial court erred in granting summary judgment in favor of Hodson.

We affirm.[1]

### FACTS AND PROCEDURAL HISTORY

On June 11, 2002, Jerry entered into a purchase agreement with Delaware County Mobile Home Sales for a manufactured home (the "Manufactured Home"). The purchase price of the Manufactured Home was $76,950. The Manufactured Home was to be delivered to real property owned by the Frenches in Delaware County.

Shortly after purchasing the Manufactured Home, Jerry sought homeowner's insurance. He called Hodson, his insurance agent of nineteen years and from whom Jerry had purchased "three or four" homeowner's policies and "[a] lot" of automobile policies.[2] Appellant's App. at 121. Hodson was an independent insurance agent who sold only State Farm Fire and Casualty Company's ("State Farm's") policies. State Farm paid Hodson "a commission per policy that [she] s[o]ld." *Id.* at 108. The amount of the insurance premium determined the amount of her commission.

---

1. We heard oral argument in this case on November 30, 2007.

2. The record does not indicate whether the Frenches had ever filed a claim with State Farm on any of their prior insurance policies.

1033

In his telephone call, Jerry "explained to Ms. Hodson's office" that he and Becky "had purchased a manufactured home." *Id.* at 80. Jerry then stated that the Manufactured Home would be "delivered" to his property sometime in July of 2002 and that he "needed coverage before it was delivered." *Id.* Hodson's office consisted of Hodson and one employee.

A few days later, Jerry and Hodson met to discuss Jerry's insurance needs. Hodson asked Jerry various questions about his new home, and she entered his responses into the Insurance–to–Value ("IV") calculator. The IV calculator is an electronic tool insurance agents use to determine a "reasonably accurate estimate of current replacement cost" coverage, although Jerry never specified the type of coverage he desired. *Id.* at 131. The questions Hodson asked Jerry for the IV calculations pertained only to the characteristics of the new home.

State Farm offered different insurance policies "determined by the type of home you have." *Id.* at 104. Specifically, according to Hodson, State Farm offered "renter[']s insurance, . . . mobile home insurance, [and] . . . homeowner[']s." *Id.* at 108. And according to State Farm, there are significant differences between a manufactured home and a stick-built[3] home:

All manufactured homes are built entirely in the factory under a federal building code administered by the U.S. Dept. of Housing and Urban Development ("HUD"). The Federal Manufactured Home Construction and Safety Standards went into effect June 15, 1976 ("HUD Code"). The purpose of the HUD Code is, in part, "to facilitate the availability of *affordable* manufactured homes and to increase home ownership

for all Americans," as well as "to encourage *innovative and cost-effective* construction techniques for manufactured homes." (Emphasis added[.])

Other purposes include to provide federal standards for the construction of manufactured homes and "to ensure that the public interest in, and the need for, *affordable* manufactured housing is duly considered in all determinations relating to the federal standards and their enforcement." 42 U.S.C. 5401. (Emphasis added[.])

The HUD Code regulates the design and construction of manufactured housing. A "manufactured" home is defined, in part, as:

. . . a structure, transportable in one or more sections, which in the traveling mode, is eight body feet or more in width or forty body feet or more in length, or when erected on site, is three hundred twenty or more square feet, and which is built on a permanent foundation when connected to the required utilities, and includes the plumbing, heating, air conditioning, and electrical systems contained therein . . .

24 CFR 3280.2.

No manufactured home may be shipped from the factory unless it has a special label affixed to the exterior of the home indicating that the home passed inspection by HUD. 24 CFR 3280.11 . . . .

The HUD Code also has a series of requirements for the design and construction of the home. 24 CFR 3280.103 *et. seq.* Every manufactured home must be designed and constructed according [to] the federal standards, and are not required to comply with any local build-

---

**3.** A stick-built home is one that is built piece-by-piece at the construction site, as opposed to a factory-built home.

ing codes that would be applicable to a stick-built home.

* * *

[A] manufactured home is also known as a "mobile home" or "double wide" trailer....

*Id.* at 241–43. Despite those apparent differences, Hodson did not ask Jerry whether his new home was a manufactured or stick-built home, nor did she ask him about the purchase price of his new home.

Once Hodson entered Jerry's responses into the IV calculator, the program indicated that the "estimate[d] replacement cost" of the home was $173,200. *Id.* at 144. After an estimate was generated by the IV calculator, it was Hodson's normal practice to review that estimate with the insurance applicant and to ask the applicant if he or she felt that the calculator's estimate suggested enough coverage. Hodson understood that customers seeking insurance from her relied on her advice and assistance when they were meeting to place coverage. And once Hodson gave the insurance estimate to Jerry, Jerry "trusted her judgment and expertise in arriving at this figure and signed off on the application." *Id.* at 81.

At some point in her interaction with Jerry, Hodson concluded that the Frenches needed additional coverage during construction of the home, even though the Frenches had purchased a manufactured home. Based on that conclusion, Hodson issued a "dwelling under construction" endorsement to the homeowner's insurance policy ("Policy"). *Id.* at 332. And because of that endorsement, State Farm's underwriting department did not require Hodson to inspect or take pictures of Jerry's

new home, which it normally would have done, before issuing the Policy. An internal State Farm document later noted that the Frenches' home had a "[c]onstruction completion date" of October 25, 2002. *Id.* at 119.

The twelve-month Policy became effective on July 9, 2002, with $173,200 in coverage for the home. The Policy provides, in relevant part,[4] that:

SECTION I—LOSS SETTLEMENT COVERAGE A—DWELLING (Applicable to HOMEOWNER'S POLICY)

A1. Replacement Cost Loss Settlement—Similar Construction is replaced with the following:

a. *We will pay up to the applicable limit of liability* shown in the Declarations, *the reasonable and necessary cost to repair or replace with similar construction* and for the same use on the premises shown in the Declarations, the damaged part of the property covered under SECTION I—COVERAGES, COVERAGE A—DWELLING, except for wood fences.

We will not pay for increased costs resulting from enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure, except as provided under Option OL—Building Ordinance or Law Coverage.

*Id.* at 186 (emphases added; original emphases removed) (hereinafter, "Coverage A"). The Frenches also purchased an "Increased Dwelling Limit" provision that increased their coverage under Coverage A by $34,640. *Id.* And under Coverage B, the Frenches insured the value of their

---

4. The Frenches also purchased coverage under section C of the Policy, regarding coverage for loss of use. However, while the Frenches dispute damages recovered under Coverage C of the Policy, as well as prejudgment interest, as discussed below neither of those issues are properly before this court on appeal. We therefore do not address them.

personal property inside the dwelling. In the event of a loss, Coverage B awarded "75% of the Coverage A amount," or about $130,000. *Id.* at 274.

By August of 2002, the Frenches had moved into the Manufactured Home. On February 12, 2003, a fire substantially destroyed the Manufactured Home. That same day, State Farm Claim Representative Michael Schliessman contacted the Frenches and reviewed the Policy. Schliessman inspected the loss the next day and met with the Frenches. Schliessman learned that the Frenches' home was manufactured and that the Frenches had purchased the Policy approximately six months prior to the fire. Nonetheless, Schliessman told the Frenches that they "could use up to the policy limits—$176,837.00[5]—to rebuild [their] home, but [they] would be responsible for costs incurred over that amount." *Id.* at 81.

Following their meeting, Schliessman mailed Jerry a letter summarizing their review of the extent of coverage available under the Policy. That letter states in pertinent part as follows:

> The expenses for your building are payable under Coverage A. Any item that is permanently attached to the dwelling is included under this coverage. Your limit under this coverage is *$176,837*.

> Your claim representative will inspect your home and probably write an estimate to repair your home. You will choose a contractor to perform the repairs, and your claim representative will work with the contractor to agree upon the amount and cost of the work to be performed. You should know the following:

1. We want you to receive quality repair work.

2. Only you can authorize work to proceed on your home.

3. The work may be done by the contractor of your choice.

4. If your contractor's estimate is higher than your claim representative's estimate, we will work with your contractor to reconcile the differences.

5. We cannot guarantee the repairs done to your home; you should consult with your contractor to be sure repairs are satisfactory.

*Id.* at 86 (emphasis indicates circled material). Jerry understood the emphasized coverage limit of $176,837 to mean that the Frenches could use up to that amount "to repair or replace [their home] with similar construction," in accordance with what Schliessman had told the Frenches and with the terms of Coverage A. *See id.* at 186.

After meeting with Schliessman, the Frenches began planning to rebuild their home. The Frenches were hesitant to purchase another manufactured home because they believed that an electrical defect in their old home had caused the fire.[6] Instead, although they intended to use the existing foundation, they wanted to build their new home on-site using a local contractor. The construction material and dimensions of the proposed new home were chosen by the Frenches in an attempt to closely mirror the material and dimensions of the Manufactured Home. The approxi-

---

**5.** As of February 12, 2003, the dwelling coverage limit had been adjusted upwards from $173,200 to reflect a change in the "area adjustment factor." Appellant's App. at 173. Including the additional coverage available under the Increased Dwelling Limit provi-

sion, the total amount available to the Frenches was $211,477.

**6.** An investigation did not establish a cause for the fire.

mate cost to build the Frenches' new home was $184,445.

The Frenches again met with Schliessman on February 28. The Frenches informed Schliessman that they intended to build a "similar" stick-built home on-site rather than to purchase another manufactured home. Appellant's Brief at 8. In response, Schliessman stated that, "pursuant to the Policy, State Farm owes the value based upon purchasing a similar or exact unit to the one that [was] recently purchased and suffered the loss." Appellant's App. at 271.

On March 5, the Frenches challenged the amount available to them under Coverage A. Schliessman informed them that it was State Farm's position that it owed the Frenches only "the actual amount to replace the unit with a similar unit." *Id.* Schliessman also told the Frenches that "if the manufactured home model that they purchased is still available, State Farm would honor the [P]olicy by paying the cost to replace with that same unit." *Id.*

On March 6, Schliessman contacted Delaware County Mobile Home Sales and learned that the model that the Frenches had originally purchased remained available. However, the cost of that model had increased. In light of that increased cost and other associated costs, State Farm offered to pay the Frenches $80,187.18 under Coverage A. The Frenches accepted that amount, but they reserved the right to seek further coverage under the Policy. The Frenches then proceeded to build their new home.

In early 2004, the Frenches brought suit against State Farm and Hodson. In Count I of their Amended Complaint, the Frenches alleged that State Farm had breached the terms of the Policy by limiting the Frenches' recovery under Coverage A to $80,187.18. And in Count II, the Frenches alleged that, "[i]f the State Farm

Policy is held to only provide $80,187.18 in coverage under Coverage A, and not the $176,837.00 the Frenches were told it would provide," then Hodson negligently failed to procure insurance for the Frenches as requested. *Id.* at 31. The Frenches also alleged that Hodson failed to advise them of the limitation on recovery based on State Farm's interpretation of the Policy. However, "[d]uring the pendency of [their] claim, the Coverage B limits were exhausted." *Id.* at 257–58, 271 n. 1. The Frenches were paid approximately $130,000 under Coverage B, or 75% of $173,200.

On March 10, 2006, the Frenches moved for summary judgment against State Farm on Count I, the breach of contract claim. And on June 21, they moved for summary judgment against Hodson on Count II. In their motion against Hodson, the Frenches' argued that, "[i]n the event this Court concludes that the Frenches are not entitled to full coverage under the Policy[,] then Ms. Hodson sold the Frenches a policy without enough coverage to rebuild their home." *Id.* at 363.

On May 12, State Farm and Hodson filed their motions in opposition to the Frenches' motions and their cross-motions for summary judgment on the Frenches' claims. In their accompanying briefs, State Farm and Hodson argued, regarding the Frenches' claim against State Farm, that: the Frenches had been "completely indemnified" by State Farm's payment of $80,187.18; the Frenches were not entitled to "an additional windfall above this amount"; and State Farm's "obligation under the policy was to pay the 'necessary' cost to 'replace' 'with similar construction,'" and "reasonable people could not honestly believe that the stick-built house was constructed in a … manner [similar] to the [M]anufactured [H]ome." *Id.* at 236, 239, 241. Regarding the Frenches' claim

against Hodson, Hodson argued that she was entitled to summary judgment because, "[a]s argued above, State Farm has fulfilled its obligations under the . . . [P]olicy." *Id.* at 250. And in making their arguments, State Farm and Hodson stated that the Frenches "purchased a $76,000 double-wide mobile home. . . . [The Frenches] were not in possession of. a $200,000 custom built, stick-built home. . . . It is patently unreasonable to suggest that the two are comparable or were similarly constructed." *Id.* at 244.

In the alternative, State Farm and Hodson maintained to the trial court that the Frenches' motions for summary judgment should be denied on the following grounds:

to the extent that this Court disagrees with State Farm's interpretation of its policy language, . . . this Court should reform the policy to reflect the intent of the parties or rescind it altogether. *The facts in dispute show that there was either a mutual mistake or an intentional concealment on the part of Mr. French during the application process.*

*Id.* at 222 (emphasis added). In their reply brief, State Farm and Hodson clarified that the Frenches "are correct that they purchased a replacement cost policy from State Farm." *Id.* at 400.

On November 1, the trial court, after a hearing, entered an order ("Order") denying both the Frenches' and State Farm's motions for summary judgment. In its Order, the court adopted State Farm and Hodson's alternative argument that either a mutual mistake of fact existed between Jerry and Hodson in the procurement of the Policy or Jerry had intentionally concealed a material fact from Hodson.[7] However, the court also granted Hodson's motion for summary judgment, agreeing with her position that "it is clear that the insurance purchased does cover the risk. The only dispute is how much coverage is owed under the [P]olicy." *Id.* at 23.

Moreover, in granting Hodson's motion, the court adopted her argument, in part, stating:

The facts that are present in this case are *NOT* whether Agent Hodson procured adequate insurance coverage—on the face of the Amended Complaint, it is evident that the policy had a policy limit of up to $176,837.00, and this limit was chosen by the insureds. . . . Rather, this case involves a coverage dispute about the interpretation of that policy. . . . Further, it is undisputed that the Plaintiffs received a substantial benefit for contents coverage [under Coverage B] from choosing the higher dwelling limits. If Ms. Hodson had sold the policy with the lower dwelling limits, the Plaintiffs would have received approximately $70,000 less in contents payments. Ms. Hodson cannot be liable for negligence with respect to the policy limits when the Plaintiffs . . . obtained a substantially higher contents payment than what they would have otherwise been able to obtain with the lower dwelling limits.

*Id.* at 25–26, 249–50. The court then concluded that the "judgment in favor of Hodson shall be deemed final as there is no

7. We note that the mistake contemplated by the trial court—whether both the Frenches and Hodson were aware that they were insuring a manufactured home rather than a stick-built home—would be a unilateral mistake, not a mutual one. *See, e.g., Jay County Rural Elec. Membership Corp. v. Wabash Valley Power er Ass'n,* 692 N.E.2d 905, 912 (Ind.Ct.App. 1998) ("[W]here *both parties* share a common assumption about a vital fact upon which they base their bargain, and that assumption is false, the transaction may be avoided." (quotation omitted; emphasis added)), *trans. denied.* Although Hodson may not have determined that the Frenches had purchased a manufactured home, it cannot be said that Jerry did not know what type of home he had purchased.

just cause for delay in entering the same."[8]  *Id.* at 26.

On December 1, 2006, the Frenches filed their Notice of Appeal from the Order "in favor of defendant Jane Hodson." *Id.* at 421. That same day, the Frenches filed a motion to certify the Order's denial of their request for summary judgment against State Farm for interlocutory appeal pursuant to Indiana Appellate Rule 14(B). The trial court denied that request on December 28, and this appeal from the summary judgment ensued.

## DISCUSSION AND DECISION

■ Our standard of review for summary judgment appeals is well established. *Asbestos Corp., Ltd. v. Akaiwa,* 872 N.E.2d 1095, 1096 (Ind.Ct.App.2007) (citing *Owens Corning Fiberglass Corp. v. Cobb,* 754 N.E.2d 905, 908 (Ind.2001)). An appellate court faces the same issues that were before the trial court and follows the same process. *Id.* The party appealing from a summary judgment decision has the burden of persuading the court that the grant or denial of summary judgment was erroneous. *Id.* When a trial court grants summary judgment, we carefully scrutinize that determination to ensure that a party was not improperly prevented from having its day in court. *Id.*

Summary judgment is appropriate only if the pleadings and evidence sanctioned by the trial court show that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Id.* (quoting *Cobb,* 754 N.E.2d at 909). On a motion for summary judgment, all doubts as to the existence of material issues of fact must be resolved against the moving party. *Id.* Additionally, all facts and reasonable inferences from those facts are construed in favor of the nonmoving party. *Id.* If there is any doubt as to what conclusion a jury could reach, then summary judgment is improper. *Id.*

The Frenches contend that the trial court erred in granting summary judgment to Hodson. Specifically, the Frenches make the following arguments: (1) Hodson overcharged them "premiums for illusory coverage," Appellant's Brief at 29; (2) Hodson breached her duty to ascertain the facts necessary to procure coverage; and (3) the Frenches' claims against State Farm and Hodson are "inextricably intertwined," Reply at 5. Thus, the Frenches reason that the trial court contradicted itself when it opined that there was either a mutual mistake of fact or a misrepresentation in the procurement of insurance, both triable issues of fact, while holding that there was no genuine issue of material fact in granting summary judgment for Hodson.[9] Hodson responds by arguing

8. The trial court held the trial on the Frenches' claim against State Farm in abeyance pending the outcome of this appeal.

9. State Farm asserts on appeal that this court is without jurisdiction to interpret the Policy because the trial court denied the Frenches' motion to certify their claim against State Farm for interlocutory appeal. We agree. *See, e.g., Daimler Chrysler Corp. v. Yaeger,* 838 N.E.2d 449, 450 (Ind.2005) (quoting *INB Nat'l Bank v. 1st Source Bank,* 567 N.E.2d 1200, 1202 (Ind.Ct.App.1991)) ("it would constitute an abuse of discretion for this court to grant an interlocutory appeal cognizable under [Rule 14(B)] where the trial court, as here, has expressly refused or denied certification." (alteration original)); *see also Allstate Ins. Co. v. Scroghan,* 801 N.E.2d 191, 195–96 (Ind.Ct.App.2004), *trans. denied.* But in considering whether the trial court erred in granting summary judgment for Hodson, without interpreting the Policy or deciding the question, we must acknowledge that the dispute over the Policy's coverage is related to the negligence claim.

that "the total amount available to the Frenches under the State Farm [P]olicy was $211,477.00. . . . This amount more than adequately covered the cost to replace the dwelling." Appellee's Brief at 25–26 (footnote omitted).

■■■ To prevail on their claim of negligence, the Frenches are required to prove: (1) a duty owed by the defendant to the plaintiff; (2) a breach of that duty by the defendant; and (3) an injury to the plaintiff proximately caused by the breach. *Florio v. Tilley*, 875 N.E.2d 253, 255 (Ind. Ct.App.2007) (citing *Ford Motor Co. v. Rushford*, 868 N.E.2d 806, 810 (Ind.2007)). It is not disputed that Hodson owed a duty to the Frenches in procuring insurance for the Manufactured Home. Indeed, "Indiana law requires an agent retained to procure insurance for another to use reasonable skill, care, and diligence to obtain the desired insurance." *Morgan v. Tackitt Ins. Agency, Inc.*, 852 N.E.2d 994, 999 (Ind.Ct. App.2006), *trans. denied; see also Anderson Mattress Co. v. First State Ins. Co.*, 617 N.E.2d 932, 939 (Ind.Ct.App. 1993), *trans. denied.* Rather, Hodson contends that she did not breach her duty to the Frenches in procuring the Policy and that, even if she did, she did not proximately cause injury to the Frenches.

■■■ Although we have serious misgivings as to whether Hodson exercised reasonable skill, care, and diligence in the procurement of more than $200,000 in homeowner's coverage for a $76,000 manufactured home, we need not address that issue. Assuming Hodson acted negligently, the Frenches have not suffered an injury proximately caused by her purported negligence. "In order for a negligent act

to be a proximate cause of injury, the injury need only be a natural and probable result thereof; and the consequence be one which in light of the circumstances should reasonably have been foreseen or anticipated." *Bader v. Johnson*, 732 N.E.2d 1212, 1220 (Ind.2000). Here, if Hodson was negligent, it was because she sold a policy to the Frenches with limits beyond that which they could reasonably expect to recover, thereby rendering the excess coverage illusory. Accordingly, the Frenches were damaged by having to pay a higher premium than they would have paid had Hodson procured the proper policy with the appropriate limits. The measure of the Frenches' damages is the difference between those two premiums.

Further, it cannot be said that the Frenches' costs in rebuilding their home is the appropriate measure of damages here. Before the Frenches began construction on their new home, State Farm informed them that it would only pay the replacement cost of the Manufactured Home, or about $80,000. Nonetheless, the Frenches chose to proceed with the construction of their new home, incurring approximately $185,000 in costs. Thus, the Frenches did not rely on Hodson's conduct when, knowing that there was a coverage dispute, they chose to proceed with construction of the stick-built home.[10]

Again, the Frenches' claim against Hodson assumes that State Farm's interpretation of the Policy is correct. However, after the Frenches were informed by State Farm of its interpretation of the Policy, the Frenches accepted approximately $130,000 under Coverage B. That figure was not based on State Farm's interpreta-

---

**10.** We note that State Farm denied the Frenches the maximum coverage under Coverage A even though it paid the Frenches the maximum corresponding coverage under Coverage B. It cannot be determined from the record whether State Farm reserved its right to straddle the coverage issue or whether State Farm may be estopped from denying the Frenches the maximum coverage under Coverage A.

tion of the Policy, but on the Frenches' belief that they are entitled to at least $173,200 under Coverage A. Had State Farm paid the Frenches' contents coverage in accordance with State Farm's interpretation of Coverage A, the Frenches would have received about $60,000. Thus, because of Hodson's purported negligence in procuring for the Frenches a policy with inflated limits, the Frenches received a benefit of more than $70,000. That sum greatly exceeds the damages the Frenches sustained in the difference between the two premiums. As such, the Frenches' damages, if any, were not caused by Hodson's alleged predicate acts, and the trial court properly granted summary judgment to Hodson.

In sum, again, there are a number of reasons to question whether Hodson took the steps necessary to satisfy her duty to exercise reasonable skill, care, and diligence in the procurement of the Policy for the Frenches. But regardless of the alleged negligence, it cannot be said that such negligence was the proximate cause of an injury to the Frenches. And the Frenches did not rely on Hodson when they decided to proceed with construction of the stick-built home. We express no opinion on the ultimate resolution of the Frenches' claims against State Farm for breach of contract. Rather, we hold only that the trial court did not err in granting summary judgment to Hodson.

Affirmed.

KIRSCH, J., and BRADFORD, J., concur.