[No. G046582. Fourth Dist., Div. Three. Dec. 28, 2012.]

ERIC REICHERT et al., Plaintiffs and Appellants, v.
STATE FARM GENERAL INSURANCE COMPANY, Defendant and
Respondent.

COUNSEL

Cummins & White and Daniel R. Wildish for Plaintiffs and Appellants.

Robie & Matthai, Michael J. O'Neill and Natalie A. Kouyoumdjian for Defendant and Respondent.

OPINION

**BEDSWORTH, Acting P. J.**—Eric and Lizbeth Reichert attempted a remodel of their newly purchased Huntington Beach house. Before construction was finished, city building inspectors discovered the project did not conform to Huntington Beach flood plain regulations, and ordered the house demolished. The Reicherts then sued their architect and their contractor, and also made a claim on their homeowners insurance policy. Their insurance company denied the claim, asserting the demolition was not an accidental loss, and in any event the loss was excluded by a provision in their policy saying there is no coverage for loss caused by the enforcement of any law or ordinance. The Reicherts sued their insurer, and the case now comes to us

after the insurer's successful motion for summary judgment. We affirm. This seems, unfortunately for the Reicherts, a rather clear example of the "law or ordinance exclusion."

## I. FACTS

The trial judge wrote an extraordinarily cogent and detailed statement of facts in his minute order granting the insurer's summary judgment motion. He looked not only at the bare statement of facts which each side agreed were undisputed, but also at the underlying evidence supporting those facts, and made appropriate record references. (See Code Civ. Proc., § 437c, subd. (c) ["The motion for summary judgment shall be granted if all the *papers* submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (italics added)].) In this appeal the Reicherts make no attempt to assert the minute order's statement of facts was in any way incorrect, and we will not attempt to improve on the trial judge's work. The next seven paragraphs are excerpted almost verbatim from the trial judge's statement of facts, though we have omitted record references and deleted some extraneous material as shown by ellipses. This was no phoned-in minute order:

In September 2007, plaintiffs Eric and Liz Reichert purchased a two-story home in Huntington Beach at 18341 Rain Circle, which sits in a designated flood zone. Shortly after closing escrow, plaintiffs hired Ben Cauthen (hereinafter Architect) to design a substantial remodel of the home. Plaintiffs also contracted with Krecu Construction (hereinafter Contractor) to perform and oversee the project as the general. Plans for the remodel were submitted to the City of Huntington Beach (City) for approval:

—The first set depicted what amounted to a "substantial" remodel since it (1) improved the overall value of the property more than 50% and (2) modified more than 50% of the existing walls. Because of this, additional planning elements were triggered, including a City "in-fill" requirement that neighbors sign off on the placement of windows and a federal FEMA requirement that the ground floor be constructed above the base flood level (which in this instance was about nine feet); since this triggered significant additional cost and headache (i.e., raising the house nine feet and staggering windows based on neighbor preference), they went back to the drawing board.

—The second set of plans was not too different from the original. One change was the designation of several existing walls that were to remain in place and become part of the new construction. By doing this, plaintiffs avoided the City's "in-fill" requirement. In addition, plaintiffs secured an

independent appraisal of their property, which, compared to the revised plans, came in at under 50% improved value—escaping the FEMA flood zone issue. As it turns out, the revised plans had a value improvement of about 49.93%, which was just barely enough to get the project permitted.

The contractor handled the job through Travis Bond (Bond), the designated on-site project manager. During the demolition phase (June/July 2008), a light bulb went on over Bond's head: the second set of plans—the one approved by the City—still called for rooms upstairs and downstairs to have 10-foot ceilings, but in order to get the City to sign off on the second set of plans, plaintiffs had covenanted to leave in place several original, existing walls. The problem? Those original, existing walls supported 8-foot ceilings, not 10-foot. Ouch.

Bond contacted the contractor and architect for direction, and was told to go ahead and tear down all the walls, including the specific walls designated to remain as part of the approved plans. Bond did as instructed, and brought the walls down.

During the next City inspection (mid-August 2008), it was discovered that plaintiffs had exceeded the scope of the permit issued. By taking out the extra walls, the square footage and value of the project increased. Plaintiffs had only $300 of wiggle room to stay under the 50% FEMA trigger, and putting in eight brand new walls clearly increased the value more than that. There was no question that removing those additional walls increased the linear footage enough to trigger the City's "in-fill" requirement. A "stop-work" order was issued, halting the project on the spot.

The contractor proposed a variance, but later learned that while the City *could* issue a variance from the FEMA requirement, doing so might cost the City its FEMA rating, leading to a widespread increase in the cost of flood insurance for every resident of the City living in a flood zone. The City expressed (informally) its unwillingness to bend the rule for the Reicherts at the risk of hurting every other Huntington Beach citizen. Plaintiffs never formally applied for the variance, as it was a foregone futility. Instead, they filed a civil action against the contractor and architect (2009-125917) and made a claim for insurance benefits from State Farm. The property (apparently the entire structure in progress) was demolished by order of the city at some undesignated time afterwards. (We end here our quotation from trial court judge's statement of facts.)

The court granted summary judgment on two theories: The demolition could not be an accidental loss as required under the insurance contract, and the exclusion of losses for enforcement of "any ordinance or law" was "fairly obvious."

## II. DISCUSSION

### A. *Law or Ordinance Exclusion*

We will pass on the question of whether the Reicherts were sufficiently involved in the decision to tear down the walls to say there was no "accidental direct physical loss" as required by the policy. As the trial judge's minute order recognized, there is at least some dispute as to how much involvement the Reicherts actually had.[1] (See *MRI Healthcare Center of Glendale, Inc. v. State Farm General Ins. Co.* (2010) 187 Cal.App.4th 766, 781 [115 Cal.Rptr.3d 27] [" 'Accidental' in an insurance policy typically means 'unintended and unexpected by the insured.' "].[2]) We move directly to what the trial judge aptly called the "fairly obvious" issue, namely, whether the law or ordinance exclusion applied.

The relevant language from the insurance policy stating the law or ordinance exclusion is this: "We do not insure under any coverage for any loss which is caused by one or more of the items below, regardless of whether the event occurs suddenly or gradually, involves isolated or wide-spread damage, arises from natural or external forces, or occurs as a result of any combination of these: [¶] a. Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair or demolition of a building or other structure."

By way of background, it is necessary to note a split in the case law regarding the law or ordinance exclusion. While the split does not *directly* involve the case before us, the dueling cases do shed light on two issues that are before us: First, just what *does* the law or ordinance exclusion apply to, and second, how exactly does "Option OL" in the Reicherts' homeowners policy operate in practice?

The split in the case law concerns whether, after a loss from a *covered* peril, such as fire, a first party property insurer is required to pay for code upgrades required to effectively replace the lost or damaged property, even if the required code upgrades mean the insureds effectively receive something better than they originally had. Courts have struggled with the question of

---

[1] The trial judge's minute order noted the Reicherts' position that they were on vacation at the time of the decision to demolish.

[2] See also *Home Savings of America v. Continental Ins. Co.* (2001) 87 Cal.App.4th 835 [104 Cal.Rptr.2d 790], involving the relatively exotic problem of whether a loss caused by a purposeful demolition by an owner to redevelop the property was "accidental" from the point of view of the mortgage company. (Answer: It was, and the mortgage company, which did not know of the demolition, was able to recover under the standard loss payable clause in the policy.)

whether a party whose house was noncompliant before the loss deserves a code-compliant house after the loss. The cases may be divided into two camps—"antiwindfall" versus "procompliant"—and in California the battle over a possible "windfall" is how the two sides have characterized their approach to the exclusion.

So, on the one hand, *Bischel v. Fire Ins. Exchange* (1991) 1 Cal.App.4th 1168 [2 Cal.Rptr.2d 575] held a property insurer was not obligated to repair a dock destroyed by careless and unauthorized mooring during a storm (a covered peril) to the extent of bringing the dock up to the condition local code required. The insurer was only obligated to pay to bring the dock back to its *preloss* condition. (*Bischel, supra,* 1 Cal.App.4th at p. 1178 [emphasizing law or ordinance exclusion "properly should have foreclosed further coverage" beyond restoration to preloss status].) *Bischel* put its imprimatur on the idea that "the purpose of insurance is not to put the insured in a better position than he or she was before the loss but rather to compensate for the actual loss sustained." (*Id.* at p. 1173.)[3]

On the other hand, *Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446 [10 Cal.Rptr.3d 617] (*Altman*) severely criticized *Bischel* as applied to cases where a policy provides *replacement* coverage. *Altman* concluded that where an insured has replacement cost coverage, then it is " 'inherent' " in the idea of *usable replacement* that, if required by code compliance, insureds will receive something better than they had before the loss if the policy contemplated replacement of the property. (*Altman, supra,* 116 Cal.App.4th at p. 464, quoting Wood, *The Insurance Fallout Following Hurricane Andrew* (1994) 48 U. Miami L.Rev. 949, 951–952.)[4]

■ The split in authority does not directly affect the case before us because the split involves situations where the loss is caused by a *covered* peril. But *Altman* and other procompliant cases are instructive for noting that the clear intent of the law or ordinance exclusion is to exclude loss when it is

---

[3] While the quotation was the court's characterization of the "common thread" of three "theories" advanced by the insurer in the case, a reading of *Bischel* as a whole—particularly its citation of similar sentiments expressed by the courts in *McCorkle v. State Farm Ins. Co.* (1990) 221 Cal.App.3d 610, 614–615 [270 Cal.Rptr. 492] and *Breshears v. Indiana Lumbermens Mut. Ins. Co.* (1967) 256 Cal.App.2d 245, 248 [63 Cal.Rptr. 879]—shows the *Bischel* court was clearly endorsing that common thread. Besides the California cases of *McCorkle* and *Breshears*, out-of-state cases consistent with *Bischel's* holding include *Cohen Furniture Co. v. St. Paul Ins. Co.* (1991) 214 Ill.App.3d 408 [158 Ill.Dec. 38, 573 N.E.2d 851], *Bradford v. Home Ins. Co.* (Me. 1978) 384 A.2d 52, and *Regency Baptist Temple v. Insurance Co. of North America* (Fla.Dist.Ct.App. 1977) 352 So.2d 1242.

[4] "Procompliant" cases consistent with *Altman* include *Dupre v. Allstate Ins. Co.* (Colo.App. 2002) 62 P.3d 1024, *Bering Strait School Dist. v. RLI Ins. Co.* (Alaska 1994) 873 P.2d 1292, *Farmers Union Mutual Ins. Co. v. Oakland* (1992) 251 Mont. 352 [825 P.2d 554], and *Garnett v. Transamerica Ins. Services* (1990) 118 Idaho 769 [800 P.2d 656].

the law or ordinance *itself*—as distinct from, say, a fire—that is the cause of the loss. (See *Altman, supra*, 116 Cal.App.4th at p. 466 [while policy did not exclude code upgrades, it did exclude "loss caused by or consisting of *enforcement*, which is not a cost, and which appears in a list of perils" (original italics)]; *Dupre v. Allstate Ins. Co., supra*, 62 P.2d at p. 1029 ["We note that similar exclusions historically have been applied when code enforcement or government order has resulted in physical damage."]; *Garnett v. Transamerica Ins. Services, supra*, 800 P.2d at p. 666 ["As we read" the law or ordinance exclusion, "it does not limit Transamerica's obligation for the cost of repair or replacement of the building when a loss has occurred that is covered by the policy, but merely states that if the loss itself is caused by an ordinance or law, there is no coverage"]; see also *Bering Strait School Dist. v. RLI Ins. Co., supra*, 873 P.2d at p. 1296 [quoting *Garnett*]; *Farmers Union Mutual Ins. Co. Oakland, supra*, 825 P.2d at p. 554 [also quoting *Garnett*].)

It is not surprising, then, that there is a small but consistent body of cases that have routinely applied the law or ordinance exclusion (or its predecessor, the civil authority exclusion) to losses caused by the enforcement of a local building ordinance or law. (See *Sweeney v. City of Shreveport* (La.Ct.App. 1991) 584 So.2d 1248, 1251 [vacant, dilapidated house, probably used to run drugs, ordered demolished by local code enforcement officer; court held exclusion applied even though code enforcement officer had sent notice to wrong address]; *Dlugokenski v. Hartford Insurance* (Conn.Super.Ct., Dec. 14, 2010, HHBCV095012898) 2010 Conn.Super. Lexis 3346, p. *7 [2010 WL 5644849] [city inspectors found dilapidated house, condemned it, and ordered it demolished pursuant to an emergency demolition order; court held exclusion applied even though the city "did not follow all due process procedures in condemning and demolishing this structure"]; *California Cafe Restaurant v. Nationwide Mut. Ins. Co.* (N.D.Cal., Sept. 14, 1994, C 92-1326 BAC) 1994 U.S.Dist. Lexis 13175 [1994 WL 519449] [governmental acts exclusion applied to café which was demolished by Caltrans (California's Department of Transportation) since café was located under San Francisco freeway considered to be unsafe after earthquake]; *Hocking v. British America Assurance Co.* (1911) 62 Wn. 73 [113 P. 259] [after insured died inside, board of health ordered house fumigated, fumigation caused fire; court held civil authority exclusion applied even if fumigation officer was negligent]; *Hawaii Land Co. v. Lion Fire Ins. Co.* (1900) 13 Hawaii 164, 172 [board of health ordered buildings burned to prevent spread of bubonic plague, fire spread to insured property; court held " 'loss caused directly or indirectly by order of any civil authority' " exclusion applied because the cause of the loss was the government order and not the plague itself].)

■ As can be seen from the above, the exclusion has been applied even where the loss has arisen out of some gaffe by a local government official, such as, in *Sweeney*, not giving proper notice of a code violation, or, as in

*Hocking*, fumigating in such a way as to start a fire.[5] We hasten to add here that this record discloses nothing at all by way of mistake on the part of anyone employed by the City of Huntington Beach. The undisputed facts show the property was demolished pursuant to the proper enforcement by the city of FEMA flood plain regulations, and in no way could the city's order be viewed as the result of some bureaucratic bungle. The City did not want to jeopardize its FEMA rating by making an exception for the Reicherts. It consciously held firm to the flood plain regulations, and the structure was accordingly demolished. The law or ordinance exclusion thus plainly applies here.

The Reicherts have two arguments against the otherwise clear application of the law or ordinance exclusion. The first involves the seldom-litigated Option OL, which was part of their State Farm General Insurance Company policy.

## B. *Option OL*

The Reicherts contend Option OL of this policy provides coverage under the circumstances we confront here. But close examination of this convoluted and recondite policy language convinces us otherwise. We think it would provide *additional* recompense for a *covered* loss, but does not provide coverage.

The text of Option OL appears in the insurance contract this way: On the declarations page, under forms and endorsements, is listed "OPT OL BLD ORD/LAW—25%." Policy limits for "dwelling" are listed at $800,000. Then, under the general heading of "Optional Policy Provisions," in the text of the policy itself appears a set of options ("AI," "BP," "BU," etc.), including "Option OL—Building Ordinance or Law."

Option OL comprises four sections. The first section is entitled "Coverage Provided." It explains *how much* Option OL actually does cover, which turns out to be an amount equal to the percentage shown on the declarations page.[6]

---

[5] At the outer fringe there are a few cases which hold that where the act of a government official was *so* unreasonable as to be outside of his or her authority altogether, a law or ordinance (or civil acts) exclusion did not apply. (See *Bankers Fire & Marine Ins. Co. v. Bukacek* (1960) 271 Ala. 182 [123 So.2d 157] [federal agent put *40* sticks of dynamite inside of illegal still inside wooden house (!) and exploded still, causing damage to house; court held governmental acts exclusion did not apply where jury could find federal agent acted unreasonably in carrying out his authority].)

[6] Exact text is: "The total limit of insurance provided by this Building Ordinance or Law provision will not exceed an amount equal to the Option OL percentage shown in the Declarations of the Coverage A limit shown in the Declarations at the time of the loss, as

The second appears under the heading "Damaged Portions of Dwelling." It explains that *increased costs* caused by enforcement of laws or ordinance—that is, the precise issue on which the *Bischel* and *Altman* courts differed—are indeed covered, as long as the enforcement is caused by the "same Loss insured."[7]

The third section is called "Undamaged Portions of Damaged Dwelling." It roughly corresponds to the second section, except its focus is on the payment the insurer will make for required code upgrades to the *un*damaged parts of a building if necessary.[8]

The final section is "Building Ordinance or Law Coverage Limitations." It spells out the limits on the payments for required code upgrades otherwise contemplated in the previous sections, including such limitations as a need to replace or repair promptly, the consideration of depreciation in some instances, and a limit based on how much the insured actually spends.[9]

adjusted by the inflation coverage provisions of the policy. This is an additional amount of insurance and applies only to the dwelling."

[7] Exact text is: "When the dwelling covered under Coverage A—Dwelling is damaged by a Loss Insured we will pay for the increased cost to repair or rebuild the physically damaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss insured and the requirement is in effect at the time the Loss Insured occurs."

[8] Exact text is: "When the dwelling covered under Coverage A—Dwelling is damaged by a Loss Insured we will also pay for: [¶] a. the cost to demolish and clear the site of the undamaged portions of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs; and [¶] b. loss to the undamaged portion of the dwelling caused by enforcement of any ordinance or law if: [¶] (1) the enforcement is directly caused by the same Loss Insured; [¶] (2) the enforcement requires the demolition of portions of the same dwelling not damaged by the same Loss Insured; [¶] (3) the ordinance or law regulates the construction or repair of the dwelling, or establishes zoning or land use requirements at the described premises; and [¶] (4) the ordinance or law is in force at the time of the occurrence of the same Loss Insured; or [¶] c. the legally required changes to the undamaged portion of the dwelling caused by the enforcement of a building, zoning or land use ordinance or law if the enforcement is directly caused by the same Loss Insured and the requirement is in effect at the time the Loss Insured occurs."

[9] Exact text is: "We will not pay for any increased cost of construction under this coverage: [¶] (1) until the dwelling is actually repaired or replaced at the same or another premises in the same general vicinity; and [¶] (2) unless the repairs or replacement are made as soon as reasonably possible after the loss, not to exceed two years. [¶] b. We will not pay more for loss to the undamaged portion of the dwelling caused by the enforcement of any ordinance or law than: [¶] (1) the depreciated value of the undamaged portion of the dwelling, if the dwelling is not repaired or replaced; [¶] (2) the amount you actually spend to replace the undamaged portion of the dwelling if the dwelling is repaired or replaced. [¶] c. We will not pay more under this coverage than the amount you actually spend: [¶] (1) for the increased cost to repair or rebuild the dwelling at ·the same or another premises in the same general vicinity if relocation is required by ordinance or law; and [¶] (2) to demolish and clear the site of the

The Reicherts say that Option OL "provides coverage for losses resulting from building, zoning or land use ordinances," but do not otherwise elaborate the point. Their formulation is imprecise to the point of inaccuracy. Their formulation *is* accurate in the sense that having Option OL gives insureds something by way of coverage they would not have without it. But it is not accurate to say Option OL *restores* coverage which the law or ordinance exclusion otherwise removes.

Context is important in this regard. The history of these options bolsters our confidence in the interpretation of the one in this case. As explained in *Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649 [75 Cal.Rptr.3d 812] (*Everett*), back in the late 1990's, State Farm gave adequate notice to its policyholders it was no longer guaranteeing replacement cost coverage. As a result, when the home of two State Farm policyholders was destroyed by fire in 2003, there was no obligation to pay for code upgrades up to policy limits. (See *id.* at pp. 658–660.)

Because of the difference in policy language, *Everett* and *Altman* are actually consistent, even though they came to opposite results. The upshot however, was that State Farm policyholders needed some protection against the extra cost of repairs necessitated by code upgrades. Enter Option OL, which does precisely that. Option OL also eliminates (again, up to the percentage shown on the declarations page) the whole *Bischel-Altman* problem of policyholders being able to rebuild and ultimately receive more than they had before the covered loss.

What Option OL does not do, however, is eliminate the effect of the law or ordinance exclusion in the first place. The first section says the option kicks in when there is a "Loss Insured." That is, there must still be a loss caused by a covered peril, and, as *Altman* noted, the law or ordinance exclusion says there is no coverage when enforcement of a law or ordinance *is* the peril.

While Option OL is little litigated, our conclusion is consistent with what case law exists.[10] Two cases in particular illustrate how Option OL works.

---

undamaged portions of the dwelling caused by enforcement of building, zoning or land use ordinance or law. [¶] We will never pay for more than a dwelling of the same height, floor area and style on the same or similar premises as the dwelling, subject to the limit provided in paragraph 1. Coverage Provided of this option."

[10] There are, to date, only four computer-accessible cases which even mention the option: *Seto v. State Farm Ins. Co.* (W.D.Pa., Oct. 16, 2012, 2:10-cv-00505) 2012 U.S.Dist. Lexis 148605 [2012 WL 1836086], *French v. State Farm Fire & Casualty Co.* (Ind.Ct.App. 2008) 881 N.E.2d 1031, 1034, *Everett, supra,* 162 Cal.App.4th at pages 658–659, and *Allemand v. State Farm Ins. Co.* (2011) 160 Wn.App. 365, 366–373 [248 P.3d 111] (*Allemand*). One of these, *French,* was not even a coverage case, but a case against an insurance agent for not having obtained the right coverage, and the court did not get into the coverage issue, simply

First there is *Everett*, the only California case to consider Option OL. In *Everett*, a home was lost to fire. The policy limits on the dwelling were $92,300, and Option OL gave the insured another 10 percent, or $9,230 to cover code upgrade costs. (See *Everett, supra*, 162 Cal.App.4th at p. 654.) The insurer paid $5,996 for code upgrades in the process of rebuilding, but the insured claimed the cost exceeded $9,230. The *Everett* court rejected the insured's breach of contract claim because there was no evidence the cost of code upgrades was as high as he contended. (*Id.* at p. 659.)

A more detailed account of the operation of the option is found in *Allemand, supra*, 248 P.3d 111. There, the insureds had a house built in 1940, which was severely damaged by fire in 2007. The policy limits were $89,866, with Option OL providing "an additional sum, equal to 10 percent of the policy maximum, for costs resulting from building code enforcement." (*Id.* at p. 112.) While it cost the insureds about $97,000 to replace the house "under modern building requirements," the insurer paid only about $60,000. (*Ibid.*) That $60,000 consisted of roughly $51,000 to repair the house to preloss condition (that is, without allowance for required code upgrades), plus about $9,000 from Option OL (10 percent of roughly $90,000). The *Allemand* court noted that $9,000 consisted of "the maximum OL coverage for the code upgrades." (*Ibid.*) The insureds sued the insurer for the $37,000 difference between the cost to replace the house and the $60,000 the insurer paid. And while they won at trial, they lost on appeal.

The *Allemand* court reasoned this way: The normal coverage under the policy (Coverage A) did not cover the cost of code upgrades. That left only Option OL, and it was limited to 10 percent of the policy limits of $90,000. The insurer had thus paid everything it was required to pay—the cost of repair independent of code upgrades ($51,000) plus another $9,000, under Option OL, to pay for code upgrades. (*Allemand, supra*, 248 P.3d at pp. 114–115.)

In the case before us, the declarations page shows the Reicherts to have an Option OL of 25 percent. Their policy limits were $800,000, i.e., had the house burned down, they would have had an extra $200,000 on top of the $800,000 to use for code upgrades, which, given the FEMA regulations applicable in Huntington Beach, would make perfect sense. But while Option OL provides an extra amount to replace for the cost of required code upgrades when there is *already* a loss from a covered peril, there is nothing in it that affects the law or ordinance exclusion.

noting the insureds suffered no loss attributable to the agent in any event, or at most paid unnecessary premiums for their policy. (See *French, supra*, 881 N.E.2d at p. 1039.)

## C. *Builder Negligence*

The Reicherts' other argument against application of the law or ordinance exclusion is a riff on the topic of concurrent causation, which has bedeviled insurance law in California courts for over 100 years since the 1906 San Francisco earthquake.[11] The Reicherts assert the efficient cause of their damage was not the governmental enforcement action, but the third party negligence of their architect or contractor and therefore their loss is covered despite the law or ordinance exclusion.

It is understandable the Reicherts should point to third party negligence as the cause of their loss, since over the years, the focus of many first party property damage causation cases turned precisely on whether third party negligence—usually builder negligence—was itself a covered peril under an all-risk policy. (E.g., *Sabella v. Wisler* (1963) 59 Cal.2d 21, 30–34 [27 Cal.Rptr. 689, 377 P.2d 889] [negligent installation of sewer line caused water leakage, which undermined foundation of house, causing subsidence; held, third party negligence manifested as a broken pipe, as distinct from excluded "settling," was "predominating or moving efficient cause of the loss" and therefore was covered]; see generally *Garvey v. State Farm Fire & Casualty Co.* (1989) 48 Cal.3d 395, 408 [257 Cal.Rptr. 292, 770 P.2d 704] [third party negligence was itself a covered peril].)

But actions can generate reactions, especially in insurance law. Insurers responded to the case law holding third party negligence to be a covered peril by adding broad language to their policies excluding losses from third party negligent conduct. (See Rutter Insurance Treatise, *supra*, ¶ 6:320, pp. 6B-58 through 6B-59 (rev. # 1, 2012) ["In an effort to bolster the enforceability of their exclusions, and especially to eliminate 'third party negligence' as a covered peril, many insurers have added a broad exclusion for negligent conduct, including acts or decisions or faulty workmanship or materials."].)

In our case, for example, the policy includes this language, stating the insurer does not insure for loss in its listed exclusions (including the law or ordinance exclusion discussed above) "regardless of whether one of more of the following (a) directly or indirectly cause, contribute to or aggravate the loss; or (b) occur before, at the same time, or after the loss of any other cause of the cause"—and then follows a list of things including "defect, weakness, inadequacy, fault or unsoundness in: (1) [¶] planning . . . . [¶] (2) design, specifications . . . [¶] of any property . . . ."

---

[11] See *Pacific etc. Co. v. Williamsburgh* (1910) 158 Cal. 367, 372 [111 P. 4] [rejecting insurer's argument that because earthquake caused fire in adjoining building that in turn spread to insured building, earthquake exclusion applied].) For a primer on concurrent causation, see Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2012) ¶ 6:134, p. 6A-37 et seq. (rev. # 1, 2012) (hereinafter Rutter Insurance Treatise).

This identical language was construed in *Freedman v. State Farm Ins. Co.* (2009) 173 Cal.App.4th 957, 961–963 [93 Cal.Rptr.3d 296]. There, the court held it meant that a contractor's negligent driving of a nail, which hit a pipe, which caused the pipe to corrode, which meant the pipe eventually leaked, which caused water damage, was an excluded peril.

In the case before us, any connection between third party negligence and the eventual loss was much more attenuated than in *Freedman*. In *Freedman* the want of a properly driven nail was the efficient cause of the loss. Here, interposed between the plans which called for the simultaneous having, and dispensing, of certain eight-foot walls and the eventual demolition of the property, was the very deliberate decision of a city not to risk its FEMA rating, and the concomitant decision to enforce its building code.

To the degree the Reicherts try to distinguish *Freedman* on the theory the policy in *Freedman* did not have Option OL, we have already explained why Option OL does not help them in this case.

## III. DISPOSITION

The judgment is affirmed. Respondent to recover costs.

Ikola, J., and Thompson, J., concurred.

Appellants' petition for review by the Supreme Court was denied April 10, 2013, S208503.